## Case No. 15,382.

### UNITED STATES v. HOLMES.

[1 Cliff. 98.] [1]

Circuit Court, D. Maine. Sept. Term. 1858.

EVIDENCE—IMPEACHMENT OF WITNESSES—CRIMINAL LAW—INSANITY AS DEFENCE—ACTS AND DECLARATIONS—EXPERT TESTIMONY.

1. Testimony in chief, of any kind, tending merely to support the credit of the witness, is not to be heard except in reply to some matter previously given in evidence by the opposite party to impeach it.

2. Evidence to confirm a witness, by proving that he has given the same account out of court, is not admissible, even although it has been proved, in order to contradict him, that he has given a different account.

3. Testimony merely rebutting is inadmissible, in anticipation of the matters to be contradicted or explained.

4. Where evidence of acts, conduct, and declarations of the accused, at various periods of his life, is introduced in defence, to prove his insanity at the time of the commission of a crime, the prosecution, in rebuttal, is not limited to an explanation or denial of the particular acts, conduct, or declarations so put in evidence in behalf of the prisoner, but may offer evidence of other acts, conduct, or declarations of the accused to show that he was sane within the same period.

[Cited in Green v. State, 59 Ark. 246, 27 S. W. 6.]

5. It is not necessary, in order to enable the proof of such other acts, conduct, and declarations to be regarded as rebutting testimony, that the prosecution should show the accused to be of sound mind at the time to which they refer.

6. The defence being insanity, the evidence of such acts, etc., is not an attack upon the character of the prisoner before he has put his character in issue, but is rebutting testimony, admitted in order that the jury may compare the prisoner's conduct on different occasions together, and thus judge understandingly upon the question in controversy.

7. Testimony legal in form, pertinent to the issue, and received without objection, cannot afterwards be stricken out by the court, merely because the foundation for its admission, by preliminary inquiry, has not been made.

8. Where the expression of an opinion of a witness not qualified to speak as an expert is so

interwoven with the res gestæ as to be inseparable therefrom, and was therefore rehearsed by the witness in his account of the circumstances of a homicide, held, that the statement that such expression was made was legal testimony, and as such was as much the subject of contradiction as any other competent testimony, and may be rebutted by proof of an inconsistent statement out of court.

9. It is not necessary, in order to impart a rebutting character to testimony, that the contradiction should be complete and entire, but it is sufficient if it has a tendency to contradict or disprove the opposite statement.

10. Although a person when committing a crime be laboring under partial insanity, if he still understands the nature and character of the act, and its consequences, and has knowledge that it is wrong and criminal, and mental power enough to apply that knowledge to his own case, and to know if he did the act he would do wrong and deserve punishment, such partial insanity is not sufficient to exempt him from criminal responsibility.

[Cited in State v. Lawrence, 57 Me. 581, 585; State v. Lewis, 20 Neb. 333, 22 Pac. 248.]

11. Such is the law of this court and in many of the best-considered decisions in the state courts.

12. Review of the authorities upon the question.

13. Wherever partial insanity is set up as an excuse for crime, if it appears that the mind of the accused is merely weakened and clouded, but is not incapable of remembering, reasoning, and judging between right and wrong in respect to his particular act, to admit in such a case that he was impelled to the commission of the act by an uncontrollable impulse would be to disregard the test of responsibility which the law establishes.

[Cited in State v. Harrison, 36 W. Va. 746, 15 S. E. 988, 989.]

This was an indictment [against John A. Holmes] for murder upon the high seas, and came before the court upon a motion for new trial. The grounds of the motion are sufficiently set forth in the opinion. It appeared from the testimony, that on the 12th of May, 1857, the American ship Therese, of which the accused was master, sailed from New York to Valparaiso, thence to Callao, thence to the Chincha Islands, and then back to Callao, at which place and time George W. Chadwick, the person alleged to have been murdered, shipped as a mariner on board the vessel for the homeward voyage to Hampton Roads. After the ship got this side of Cape Horn, and before the time of the homicide, a difficulty had arisen between the accused and Chadwick, in consequence of the latter having omitted to sing, while hauling at the lee brace, as sailors are accustomed to do, and the accused beat, maltreated, and threatened him in violent and profane language. Afterwards, meeting Chadwick on deck, the master adverted to this omission as a neglect of duty, and repeated his threats in still more violent terms. Some time subsequent to this occurrence, Chadwick was at the wheel, and the witnesses testified they heard the accused speaking to him from the cabin, and inquiring how the vessel was heading. The question was correctly answered, but the customary "sir" was omitted.

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

Upon this the accused immediately called out again, "How is that you say?" and the answer was given the same as before. In a few minutes, the accused came up from the cabin with a belaying-pin in his hand, and began beating the sailor, Chadwick, with it, upon his head. The blows were continued after the sailor was prostrated on the deck, and until he regained his feet and started to run forward; he was soon brought back by the second mate, acting under the master's order, and the beating renewed, until he was covered with his own blood. He was then stripped, washed,—his clothes thrown overboard,—and triced up in the main rigging. The accused then took a strand of yarn, knotted it, and ordered the men to flog the sailor thus triced up, and the order was obeyed for some twenty minutes. After several times reproving the men for not striking hard enough, and inflicting several blows himself, the master doubled and knotted a piece of ratlin stuff, and ordered this to be used in place of the yarn. Groans and cries several times escaped from the lips of the sufferer, but were in every instance silenced by the belaying-pin in the hands of the master. After a brief interval, during which the beaten man was carried to and brought back from the forecastle, he was again beaten with the belaying-pin, again triced up in the rigging, and a second time flogged with the ratlin. On this second occasion, as the sailor, Chadwick, cried for mercy, the accused answered, "If you don't stop your noise, I'll kill you on the spot"; and thereupon renewed the blows with the belaying-pin upon his head, neck, and side, until he sank down, supported only by his hands, which were tied to the rigging. He was then taken down and laid on the deck, where unsuccessful efforts at resuscitation and bleeding, showed that he was dead. When it was found that life was extinct, the accused remained standing for a few moments in silence on the deck, and then, with his mates, retired to the cabin. They remained in the cabin about twenty minutes, when the mate came on deck, called all hands aft, told them that he now had charge of the ship, and that the captain was crazy. It was not denied, on the part of the accused, that the sailor, George W. Chadwick, came to his death by violence and by the hands of the accused; but the defence was placed solely upon the ground, that at the time the homicide was committed, the prisoner was so far insane as not to be criminally responsible for the act. Upon this question witnesses were introduced and examined, both by the defence and the prosecution, and acts, conduct, and declarations of the prisoner at different periods and under different circumstances, throughout nearly his whole life to the time of the arrest, were offered in evidence. Acts and declarations, and the constitution of the prisoner when quite young, were detailed and described in the testimony, as well as

his conduct upon voyages remotely and immediately preceding the one during which the homicide was committed. The jury returned a verdict of guilty. The motion for a new trial was based upon certain alleged incorrect rulings of the court in the course of the trial, and upon alleged misdirections in matters of law in the final instructions given to the jury.

G. F. Shepley, U. S. Dist. Atty., for the prosecution.

G. Evans and P. Barnes, for the defence.

CLIFFORD, Circuit Justice. Motions for new trials in the federal courts are not always exhibited to the court for verification before they are filed. Usually they are prepared by the party objecting to the verdict, within the time prescribed by the twenty-sixth rule, and not unfrequently are filed with the clerk of the court without any examination by the opposite side, where they sometimes remain upon the files until the argument, without any revision whatever. Drawn from the minutes of the counsel or from recollection, it not unfrequently happens that they require some correction in order that they may accord with the actual rulings and instructions of the court at the trial. No inconvenience results from the practice, as the whole subject is one entirely within the control of the court, whose undoubted province it is to revise such motions if any error has intervened, either at the time of the argument or when its opinion is finally delivered. U. S. v. Gibert [Case No. 15,204].

Two classes of complaints are embraced in the motion, each containing several distinct objections to the action of the court. One class has respect solely to the rulings of the court in admitting or rejecting evidence in the course of the trial. Another and a distinct class has respect to the instructions given to the jury when the case was finally submitted to their determination. Those appertaining to the rulings of the court in admitting and rejecting evidence will first be considered, for the reasons that they were made in the progress of the trial, and that the weight of such objections cannot be satisfactorily determined without some reference to the circumstances of the case under which the evidence was offered. In considering this class of objections, therefore, it becomes necessary to recur to the proceedings in the trial, and somewhat to the evidence, as it was developed at the trial, in order that the exact circumstances under which each particular ruling was made may be fully and clearly understood.

According to the record, the indictment was filed in court on the 25th of September, 1858. It alleges to the effect that the prisoner, on the 22d of January, 1858, upon the high seas, out of the jurisdiction of any particular state, and within the admiralty and

maritime jurisdiction of the United States and of this court, in and on board a certain American vessel called the Therese, in and upon one George W. Chadwick, piratically, feloniously, wilfully, and of his malice aforethought, did make an assault, and that the prisoner with a certain instrument called a belaying-pin, in and upon the head, neck, back, and left side of him, the said George W. Chadwick, then and there on the high seas, in the vessel aforesaid, did strike, giving to him, the said George W. Chadwick, then and there, several mortal wounds, blows, and bruises, to wit: one mortal wound on the head of him, the said George W. Chadwick, of the length of three inches and of the depth of one inch; one mortal bruise and wound on the neck of him, the said George W. Chadwick, of the length of three inches and of the depth of one inch; one mortal bruise on the back of him, the said George W. Chadwick, of the length of six inches and of the depth of one inch; one mortal bruise on the left side of him, the said George W. Chadwick, of the length of four inches and of the breadth of two inches, of which mortal wounds and bruises the said George W. Chadwick then and there instantly died. It contains two counts, and in each there is the usual conclusion, charging that the prisoner, piratically, feloniously, wilfully, and of his malice aforethought, him, the said George W. Chadwick, in manner and form aforesaid, did kill and murder.

He was arraigned on the 28th of September, 1858, and pleaded that he was not guilty. His trial was commenced on the 5th of October following, pursuant to an assignment previously made at the request of his counsel. No objection is made to any of the proceedings at the trial, except what are contained in the motion under consideration. In opening the case, the district attorney confined his remarks to the discussion of the principles of law applicable to the charge made in the indictment, and to a brief statement of the evidence to be introduced to prove it. He called some seven or eight witnesses in the opening to prove the necessary allegations, to show the jurisdiction of the court, the act of killing, as laid in the indictment, and all the material elements of the crime.

(At this point the court recapitulated the testimony which substantially appears in the foregoing statement.)

Such is the substance of the testimony produced by the government in the opening, so far as respects the jurisdiction of the court, the fact of homicide, and all the material elements of the crime charged in the indictment. Many other facts and circumstances material to the question, whether the prisoner was sane or insane when the act was committed, were elicited in the cross-examination, which it is unnecessary to reproduce in this investigation.

The testimony of the witnesses for the defence varied in several important particulars from the narration previously given by the government witnesses. Many new facts were also stated, which had more or less bearing upon the question of sanity or insanity presented by the defence. That remark is more particularly applicable to the testimony of the second mate, who was examined as to all the circumstances attending the homicide, as well as to those which followed, and in many particulars his statements differed widely from the statements of the seamen previously examined; but as those discrepancies and contradictions do not give rise to any legal question, they will not be specified. One part of his testimony, however, is material in this investigation, and that part only will be particularly stated. Speaking of the efforts to resuscitate the deceased while he lay on the deck, and before the prisoner retired from the scene, the witness says he went to the cabin to get some hartshorn, thinking that hartshorn would revive the deceased if he had any life in him; and as he went, he says, he looked into the mate's room, and said to him, "For God's sake come on deck, for I believe the captain is crazy, and is going to kill us all." This statement of the witness was made in the examination in chief, and was given as a part of the circumstances which took place while the prisoner was standing over the dead body, and before the mate came on deck, as stated by the government witnesses. Both of those witnesses were fully examined as to the acts, conduct, and declarations of the prisoner throughout the voyage, both before and after the homicide, up to the time the ship arrived at Pernambuco, and while she remained in that port. It appeared from their testimony, as well as from the testimony of the master of the ship Andalusia, who was also examined as a witness for the defence, that the prisoner was sick at the Chincha Islands, in consequence of an injury he received in the head while on shore; and the latter gave a particular description of the injury, and a minute statement of his acts, conduct, and declarations during his sickness. His acts, conduct, and declarations immediately after the homicide, and during the five days that elapsed before the ship arrived at Pernambuco, were also very fully narrated by the second mate, in whose charge the prisoner remained ever after he retired to the cabin on the day the homicide was committed, until he arrived in New York in the bark Emperador, about the middle of March following.

Many other witnesses were also called, and examined as to his prior and subsequent acts, conduct, and declarations when not at sea, covering nearly the whole period of his life, from early youth to the time of his arrest. The brother-in-law of the prisoner, Joseph A. Cargill, was examined upon this point, and testified to certain attacks of pain in the head which the prisoner had suf-

fered on a voyage previous to the one during which the homicide was committed, and to his violent conduct and language during those attacks. Near the close of his examination in chief, after the witness had stated the time of his return and his arrival at the house of his father in Newcastle, in this state, he was asked by the counsel for the prisoner whether he mentioned these occurrences during the voyage to any of his family or to any of the family of the prisoner. That question was objected to by the district attorney, and ruled out by the court, upon the ground that the inquiry was irrelevant to the issue, and that it was incompetent for the prisoner to fortify his own witness by declarations made out of court, and not under oath. This ruling presents the first question to be determined at the present time. In the motion as filed in the case, it is numbered five in the list of causes assigned for a new trial; but it is in fact the first cause of complaint when considered in the order of events as they occurred at the trial. As before remarked, the question was asked in the examination in chief, and, of course, before the witness was cross-examined. No principle in the law of evidence is better settled than the one enunciated in the rule, that testimony in chief of any kind, tending merely to support the credit of the witness, is not to be heard except in reply to some matter previously given in evidence by the opposite party to impeach it. Jackson v. Etz, 5 Cow. 320; 2 Cow. & H. notes, 776. When this question was asked and excluded, nothing had been given in evidence by the other side to impeach the credit of the witness, and it was for that reason that it was ruled out as incompetent and immaterial. Tested by the circumstances under which the testimony was offered, it is clear it could have had no tendency to prove the issue, and in fact and truth could have had no other effect except to fortify the credit of the witness. Evidence to confirm a witness, by proving that he has given the same account out of court, is not admissible, even although it has been proved, in order to contradict him, that he has given a different account. Rex v. Parker, 3 Doug. 242; Robb v. Hackley, 23 Wend. 55; Ware v. Ware, 8 Greenl. 55; 1 Greenl. Ev. 469.

It was suggested at the argument that the testimony called for by the question was offered, not to fortify the credit of the witness, but to prevent any misconstruction of his conduct arising out of the circumstance that the prisoner married his sister shortly after his return from that voyage. Admit the fact to be as stated, and it is not perceived that it changes the aspect of the question in any degree, as the difficulty still remains in all its force, that at the time the question was asked and ruled out there was nothing in the case to which the answer, whether given in the affirmative or negative, would apply as rebutting evidence. At that time the ques-

tion whether the witness objected to the marriage of his sister had not been asked, and certainly it cannot be maintained that testimony merely rebutting is admissible in anticipation of the matters to be contradicted or explained. Such a rule would be a very inconvenient one, and finds no support either in the decided cases or in the practice of the federal courts. But suppose the answer, had it been admitted, would have been accompanied by the statement, as assumed by the counsel, that he did object to the marriage of his sister, or that he did not. Still the testimony would not have been admissible, for the plain reason that it would not have afforded any explanation of his conduct in the particular under consideration, except so far as it disclosed, either directly or indirectly, his opinion as to the sanity or insanity of the prisoner at the time the occurrences took place. Testimony in general is limited to matters of fact within the knowledge of the witness, and it is only when the subject-matter of the controversy is such as to require peculiar experience, study, or skill to understand it, that persons professionally acquainted with the trade, science, or practice are permitted to give their opinions, showing conclusively that two prerequisites are essential to the admissibility of such testimony: first, that the inquiry be one appertaining to a matter of trade, skill, or science; and secondly, that the witness called be one qualified to speak upon the subject. Tested by this rule, it is clear that the opinion of this witness was not admissible, as he was in no proper sense qualified to speak upon the subject of diseases of the mind. 1 Greenl. Ev. § 440. In every point of view, therefore, we are satisfied that this ruling was correct, and that it affords no ground whatever for a new trial.

Inquiries were made of this witness, in his examination in chief, not only as to the acts, conduct, and declarations of the prisoner during the attacks, but on other occasions throughout the voyage. It appeared from his testimony that the prisoner also had an attack of sickness while the ship lay at Acapulco, in the republic of Mexico, and particular inquiry was made of him as to the acts, conduct, and declarations of the prisoner during that attack. Among the incidents of this occasion, the witness says he saw the prisoner carried from the cabin up the companion-way to the deck by the mate, carpenter, steward, and cook, and that afterward he saw them holding him on the deck. At one time, he says the prisoner got away from them, and made an attempt to jump over the rail of the vessel, when they caught him and brought him back to the house of the ship. All these particulars, and many others of a kindred character during the voyage, were stated by the witness in his examination in chief. He was then cross-examined by the district attorney. In the course of the cross-examination, he was asked whether any diffi-

culty occurred during the voyage between the prisoner and the mate. That question was objected to by the counsel for the prisoner, and was admitted by the court. Considered in the order of events as they occurred at the trial, this ruling constitutes the second cause of complaint. In answer to this question, the witness stated that he had heard the prisoner and the then mate have loud talk, but could not state the conversation or what it was about. Corresponding questions were then put to the witness, in answer to which he stated that the then mate left the ship at Acapulco, after she had been there about two weeks, and that he was succeeded by another, who went to Callao, and there left the ship. Some difficulty took place between him and the prisoner about bending the topsail. A third was then appointed, who was discharged shortly afterward on account of his intemperate habits. At the Chincha Islands a fourth was appointed, who continued to fill the place until the ship arrived at Hampton Roads, when he ran away. Difficulty occurred between the prisoner and the mate last appointed on two occasions. One during the passage, and the other the night before he left the ship. Various acts, conduct, and declarations of the prisoner, during those difficulties, were stated by the witness in answer to the questions propounded by the district attorney. It is insisted by the counsel for the prisoner that the question objected to should have been ruled out, and that all the testimony of this witness, so far as respects the acts, conduct, and declarations of the prisoner during these difficulties, was improperly admitted. (1) They contend that the effect of the rulings was to allow the government to establish the offence charged against the prisoner, by proving that he had committed other acts of violence of a like kind. (2) In the second place, they insist that the rulings authorized an illegal attack upon the character of the prisoner, when, in fact and in truth, he had offered no evidence putting his character in issue. (3) And lastly, they contend that the evidence was a surprise upon the prisoner, who could not be expected to come to trial on the charge in the indictment, prepared to defend his whole life.

All the answer that need be given to the first proposition is, to state that the theory of fact on which it is based is not correct, and to refer to what has already appeared in verification of the statement. It is a mistake to suppose that the evidence in question, or any part of it, was admitted, or even offered as having any bearing whatever upon the question whether the prisoner was the guilty agent who committed the act of homicide charged in the indictment. His agency in that behalf had been admitted by his counsel in the opening of his defence, and was no longer a matter in question at the trial. In the opening of the defence his counsel stated, in effect, that they did not controvert the

fact that the deceased came to his death by violence, or that the violence was committed by the hands of the prisoner; but insisted, as before stated, that the prisoner was so far insane at the time he committed the homicide that he was not criminally responsible for the act. Much of the time occupied in the trial was spent on this new issue, very properly raised by his counsel at the opening of the defence. It was upon this ground that the trial proceeded; and after the defence was opened, it was to this point that the efforts of counsel on both sides were directed.

On the part of the prisoner, many witnesses had been called and examined, and his acts, conduct, and declarations, not only throughout this voyage, but throughout his whole life, from early youth to the time of his arrest, had been introduced into the case. His counsel, in offering his acts, conduct, and declarations, called the attention of the witnesses to such occurrences and incidents in his life and conduct as they supposed were material to support the defence set up by the prisoner. That examination extended to his mental, moral, and physical condition at many and different periods of his life, both before and after the homicide was committed. Some of the witnesses referred to particular sicknesses and incidents in the life of the prisoner, and all were allowed to state his acts, conduct, and declarations at the particular times and in respect to the particular transactions to which their attention was directed by the examining counsel. Evidence tending to show hereditary insanity in his family had also been introduced; and, in fact and truth, the counsel had claimed and exercised the right to examine the witnesses so called upon all such occurrences, acts, and declarations in the life and conduct of the prisoner as tended to show that he was insane, or that there was any tendency, either in his mental or physical condition, to that state of mind. They accordingly selected, as was very properly admitted at the argument, the dark spots in his life, or those most peculiar and least in accordance with the ordinary conduct of men, as best suited to support the defence set up by the prisoner in this case. All of the testimony objected to, and now under consideration, was admitted in reply to that which had previously been introduced by the prisoner to support that ground of defence.

One of the suggestions at the trial in support of the objection was, that the government, in attempting to rebut the testimony offered by the prisoner on this point, should have been limited to the explanation or denial of the particular transactions, acts, conduct, and declarations introduced by the prisoner to make out his defence. That rule would be a very convenient one if it were the sole purpose of the law to acquit the guilty by establishing this ground of defence upon a partial view of the facts; but so

long as it continues to be the purpose of the law, and of those who administer it, to ascertain the truth, the limitation suggested by the counsel for the prisoner, cannot be sustained. Most men in the course of their lives, in times of excitement produced by disease or otherwise, do many strange or peculiar acts, and oftentimes give utterance to eccentric or unusual language; and it is obvious if a person accused of crime may select and offer in evidence all the dark spots of his life, or every peculiar and unusual act and declaration, and be allowed to exclude all the rest, that many guilty offenders must escape, and justice often be defeated, because the means of ascertaining the truth are excluded from the jury. Persons accused of crime have a right to set up this defence, and when proved according to the rules of law, to the satisfaction of the jury, upon a view of all the facts, it is a legal and just defence. Beyond doubt the precise question to be tried in all such cases is, whether the accused was insane at the very time he committed the act, and to that point all the evidence must tend. Great difficulties surround the inquiry, and it is for that reason that the rules of law allow a wide range of testimony in the investigation. Proof of hereditary insanity is therefore admissible as affording some ground of presumption that the alleged diseased state of mind may have descended through those from whom the accused derived his existence. Reg. v. Tucket, 1 Cox, Cr. Cas. 103; Reg. v. Oxford, 9 Car. & P. 525.

Evidence of acts, conduct, and declarations, both before and after the time of committing the act, tending to show an insane state of mind are also admissible, as having some bearing upon the exact point in controversy. Lake v. People, 1 Parker, Cr. R. 556; Peaslee v. Robbins, 3 Metc. (Mass.) 164; Grant v. Thompson, 4 Conn. 203; 1 Ben. & H. Lead. Cas. 104. On the trial of this indictment that rule was observed, and every proper latitude was allowed to the counsel to show the acts, conduct, and declarations of the prisoner, both before and after the homicide was committed; and it is but just to say that the right was exercised to its fullest extent. Whenever that right is exercised in behalf of the accused, it follows, as a necessary consequence of the rule conferring the right, and as a material and essential part of the rule itself, that the government may offer evidence of other acts, conduct, and declarations of the accused within the same period to show that he was sane, and to rebut the evidence introduced for the defence. To that extent, at least, the rule of law is clear and undeniable, and to that extent only was it allowed in this case under the ruling of the court. Another suggestion of the counsel for the prisoner, however, deserves to be considered before leaving this branch of the case. They contend, that proof of other acts, con-

duct, and declarations, though within the period of time covered by the inquiry in behalf of the accused, cannot be regarded as rebutting testimony, unless it be first shown that the accused, at the time to which the inquiries for the government refer, was of sound mind and memory. To admit the proposition as stated would be to exclude the evidence in all cases; as the question of sanity or insanity is for the jury, and their opinion cannot be taken during the progress of the trial. All the cases herein cited to the point show that such evidence, tending to prove an insane state of mind, is admissible for the prisoner; and by the same rule of law, and for the same reasons, evidence tending to show that he was sane within the period opened for examination is admissible for the government to rebut the evidence previously introduced for the accused. For these reasons we are of the opinion that the proposition cannot be sustained.

Enough has already been said in this case to show that the second objection to the admissibility of the evidence under consideration cannot be maintained. Like the preceding proposition, its great and controlling error consists in the theory of fact on which it is based, as will presently more fully appear. Beyond question, every person accused of crime is presumed to be innocent until he is proved to be guilty; and no circumstance at the trial, except evidence of his good character previously introduced by the accused himself, can justify the court in allowing the government to introduce evidence to show that his character is bad. Such evidence is never admitted until the accused has first put his character in issue, or, in other words, has laid the foundation for its introduction by offering evidence to show that he is of good character; and then the counter-proof is properly admitted as rebutting testimony. These principles are elementary, and perfectly familiar to any one at all acquainted with the criminal law; and they are principles of very great moment to the accused, and as such ought always to be respected, strictly observed and enforced, and constantly applied. No such testimony was admitted in this case, and, what is more, none such was offered by the government. All the evidence under consideration appertained to the acts, conduct, and declarations of the prisoner in his intercourse, as master of the vessel, with those under his command, and was admitted as rebutting testimony, in order that the jury might have the appropriate means legitimately before them of comparing the prisoner with himself, and thus be enabled understandingly to determine the question in controversy, whether the prisoner was sane or insane at the time he committed the act of homicide charged in the indictment. Unless it be assumed that evidence pertinent to the issue, and essential to the inquiry,

may constitute an attack upon the character of one on trial, there is no foundation to support the argument, that the testimony under consideration should be viewed in that light; always bearing in mind that the subject-matter of the inquiry, to which the testimony is applied, was not whether the prisoner committed the act of homicide, but whether he was sane or insane at the time it was committed. Failure to discriminate in this behalf lies at the foundation of a large portion of the error plainly discoverable in the argument for the prisoner.

Two or three observations as to the third proposition will be sufficient, as it was much less relied on at the argument upon the motion for new trial than in the discussion which took place at the bar when the objection was made. Surprise may often arise out of the offer of evidence strictly competent, and yet that circumstance has never been considered as affecting the question of its admissibility. Embarrassments of that sort, which are more or less incident to every trial, are usually remedied by motion to the court for a postponement of the trial to a future day in the term, or for a continuance. Such motions are addressed to the discretion of the court, and, whether granted or refused, are not the proper subjects of exception or error. It is not, however, in that sense that the objection in this case is urged, as no such motion was made, and of course there can be no complaint that it was not granted. In this case the objection is pressed rather as an argument ·to show that the evidence was not admissible, and as that point has already been considered and determined, further discussion of the subject is unnecessary.

Additional testimony was then introduced. Experts were called and examined upon the subject of insanity, and they were allowed to give their opinions in answer to such hypothetical questions pertinent to the case on trial, as the counsel thought proper to propound. Rebutting testimony was then introduced by the government. One Joshua R. Trevet was called and examined. In answer to preliminary inquiries, he stated that he resided in Wiscasset, in this state; that he was acquainted with the prisoner, and sailed with him in the year 1855 in the ship Ontario, which was commanded by the prisoner during the voyage. He also testified that a man by the name of Furlong was a seaman on board the ship. At that stage of the examination he was asked by the district attorney to state what occurred during this voyage between the prisoner and that seaman. To that question the counsel for the prisoner objected; but the court ruled that it was admissible, and the witness answered, giving a very full account of certain difficulties that occurred in August, 1855, on the morning after he arrived at Trapani, in Italy. All the acts, conduct, and declarations of the prisoner during this occurrence were fully stated by the witness. Much discussion took place at the trial upon the objection made by the prisoner's counsel, but the testimony was ruled to be admissible, upon the same ground and for the same reasons previously given, when the objection was made to the question propounded to his brother-in-law in the cross-examination respecting the events of the succeeding voyage. Both rulings present the same question and involve the same legal considerations; and we are satisfied they were correct, for the reasons already given, which need not be repeated. When a person accused of crime relies upon his prior and subsequent acts, conduct, and declarations to show that he was insane at the time he committed the act charged against him, and actually offers them in evidence to establish that defence, we entertain no doubt that it is competent for the government to introduce other acts, conduct, and declarations of the accused, within the same period, to rebut that presumption, and to show that he was sane. Were it otherwise, it is not perceived how this class of legal investigations can be satisfactorily conducted, as jurors, if the proposition assumed by the counsel for the prisoner be correct, must always be compelled in cases like the present to decide the question of sanity or insanity upon a partial view of the facts, and may often be deprived of the means of ascertaining the truth. Courts of justice have established the principle that such evidence is admissible for the accused, whenever he sees fit to offer it, and so long as that rule continues in force it must of necessity be competent for the government to introduce countervailing proof.

One other objection only remains to be considered, in connection with the rulings of the court at the trial. That question arises out of the testimony of Daniel Randal, who was called and examined by the government. He stated that he had a conversation with the second mate on the day before the witness went before the grand jury; that he asked him in his shop, whether he thought the prisoner was crazy when the affair occurred on board the Therese, and that the second mate replied that the prisoner was no more crazy than he was. This testimony was admitted without objection, and the witness, after the examination was closed, passed off the stand. Another witness was then called, and upon being examined upon the same subject without objection, gave a similar answer. After his examination had been completed and he had left the stand, a third witness was called by the government, and the question asked to the effect whether he had heard the mate say anything upon that subject. This last question was seasonably objected to by the counsel for the prisoner, and was ruled out by the court upon the ground and for the reason that the mate, in his examination in chief, had not

testified to anything connected with the circumstances of the homicide before the prisoner left the deck, which the testimony offered was suited either to rebut or explain. Whereupon the counsel for the prisoner moved the court to strike out the testimony introduced to contradict the second mate, upon the ground that it was not admissible, and had been improperly received. That motion the court refused to grant; and the refusal of the court in that behalf constitutes the basis of the fifth, sixth, and seventh causes assigned for a new trial.

Two objections were taken by the counsel at the argument to the ruling of the court, in refusing to strike out the testimony. They contend, in the first place, that the testimony had been improperly received, because the foundation for its admission had not been laid in the cross-examination of the second mate. When the second mate was cross-examined, the district attorney did not inquire of him whether he had ever made such a statement to either of the witnesses. That objection goes to the right of making the inquiry, and not to the competency of the testimony; and if the objection had been seasonably made, the question could not have been put. But it was not made until the question was put and answered without objection, and therefore the testimony was legally in the case, if it was competent and relevant to the issue. As a general rule it is not to be expected that the court will interfere mero motu to exclude testimony, otherwise competent, merely because the preliminary inquiry has not been made, unless the question is objected to on that ground by the other side; and if not objected to, and the testimony is received, it is not then competent for the court to strike it out if it is legal in form and pertinent to the issue. In the state courts the rule, that the preliminary inquiry in such cases must first be made, is never enforced, and if testimony is admitted without objection on that ground, in the federal courts, it would not be competent for the court afterward to strike it out merely on that account.

More importance is attached to the second objection, and it deserves to be more carefully considered. In the second place, it is insisted that the testimony of these witnesses was not admissible, because it had no tendency to contradict or rebut any statement made by the second mate. This denial makes it again necessary to refer to his testimony, in order that the exact state of the case may be seen and understood. In relating the circumstances attending the homicide, he testified that he looked into the mate's room and said to him, "For God's sake, come on deck, for I believe the captain is crazy, and is going to kill us all." This statement had been given by the second mate, in his examination in chief, as a part of the res gestæ, and as such was clearly ad-

missible, as substantive testimony. Neither its admissibility nor its importance to the prisoner can be denied. As a general rule, the opinions of witnesses not qualified to speak as experts are not admissible, but it will sometimes happen, as in this case, that their opinions are so connected with the res gestæ, and so interwoven therewith, that they inseparably become a part thereof, and in such cases they are legal testimony, as much as any other part of the transaction; and whenever that is the case, they become as much the subject of contradiction as any other legal and competent testimony, and may be rebutted or explained in the same way. Decided cases have established the rule that, whenever the circumstances of the case are such as to allow evidence of opinions to be received, the opposite party, after laying the foundation, may call other witnesses and prove, for the purpose of contradicting the witness whose opinion has been introduced, that he has expressed an inconsistent opinion out of court. 1 Greenl. Ev. § 449, and cases cited. That principle is applicable to this case, notwithstanding the preliminary inquiry had been omitted in the cross-examination of the second mate, as the questions to the witnesses called to rebut his testimony were allowed to be put, and the testimony in question was received without objection. For all purposes connected with the defence of the prisoner, on the ground assumed by the counsel, the opinion of the second mate had been given in evidence in his examination in chief, and none the less effectually, because it had been recited by him among the circumstances attending the act of homicide. That opinion being thus in the case, it was certainly a proper subject of contradiction; so that the only remaining question on this branch of the case is, whether the evidence in question was of a rebutting character. Rebutting evidence is that which is given by a party in a cause to explain, repel, contradict, or disprove the facts given in evidence by the other side. Directness, in the technical sense, is not essential to give the evidence that character, nor is it necessary that the contradiction should be complete and entire, in order to admit the opposing testimony. Circumstances may be offered to rebut the most positive statement, and it is only necessary that the testimony offered should have a tendency to explain, repel, counteract, or disprove the opposite statement, in order to render it admissible. Its weight and sufficiency, as in other cases, are for the consideration of the jury. Applying these principles to the matter in question, it is so obvious that the testimony under consideration had a tendency to rebut the prior statement of the second mate, that further discussion of the question is, we think, unnecessary.

All of the questions presented in the causes assigned for a new trial, so far as respects

the rulings of the court, having been determined, we will now proceed to the consideration of those arising out of the instructions of the court to the jury. Periodical mania was the form of mental disease set up in this case, and relied on in the defence to excuse the prisoner from the charge against him in the indictment. It was agreed by the experts that the evidence in the case tending to show that the disease was occasioned by any delusion was very slight. One of them testified that the indications of delusion in this case were very few, and added that he was not sure that the prisoner labored under any delusion. Another testified, that he did not see any indications of delusion, regarding delusion in its strictest sense. Such of the instructions only as are material to questions raised by the motion for new trial will be reproduced. In effect, the jury were told, that if they came to the conclusion that the government had not made out the whole charge, as laid in the indictment, beyond a reasonable doubt, it would be their duty to find that the prisoner was not guilty. On the contrary, if they found from the evidence that the whole charge was proved beyond a reasonable doubt, provided the prisoner, at the time he committed the homicide, was in a state of mind to be criminally responsible for his acts, that then they would turn their attention to the principal ground of defence, and in that view of the case they were instructed that, in legal contemplation, every person on trial under a criminal charge was presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, unless the contrary was proved to the satisfaction of the jury, and that to establish a defence on the ground of insanity, it must be clearly proved to the satisfaction of the jury, that the party accused, at the time of committing the act, was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing wrong. They were also instructed that a person was not to be excused from responsibility if he had, at the time he committed the act, capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he was then doing, a knowledge and consciousness that the act he was then doing was wrong and criminal, and would subject him to punishment; that in order to be responsible he must have sufficient power of memory to recollect the relation in which he stands to others and others stand to him, and that the act he was doing was contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. In the same connection, immediately following, the jury were also instructed, that although the person was laboring under partial insanity, if he still understood the nature and character of the act and its consequences, and had a knowledge that it was wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and to know that if he did the act he would do wrong and deserve punishment, such partial insanity was not sufficient to exempt him from criminal responsibility. This last instruction, upon the subject of partial insanity, is the one to which exception is taken in the eighth cause assigned for a new trial. Upon this subject two things are certain: first, that the instructions are drawn in strict accordance with the settled law in this court; and, secondly, that the law of this court is the same as the law of England, and in those states in this country whose judicial decisions are entitled to the most respect. Reference is made, in support of the first remark, to the case of U. S. v. McGlue [Case No. 15,679], decided by Mr. Justice Curtis in 1851. In that case, the learned judge said that the law supplied a test by which the jury is to ascertain whether the accused be so far insane as to be irresponsible. That test is the capacity to distinguish between right and wrong as to the particular act with which the accused is charged. If he understands the nature of his act, if he knows his act is criminal, and that if he does it he will do wrong and deserve punishment, then, in the judgment of the law, he has a criminal intent, and is not so far insane as to be exempt from criminal responsibility. On the other hand, if he is under such delusion as not to understand the nature of his act, or if he has not sufficient memory and reason and judgment to know that he is doing wrong, or not sufficient conscience to discern that his act is criminal and deserving punishment, then he is not responsible. Some of the cases will now be referred to which substantiate the second remark. They are as follows: Case of McNaghten, 10 Clark & F. 210, and 1 Car. & K. 130; Reg. v. Oxford, 9 Car. & P. 525; Rex v. Offord, 5 Car & P. 168; 1 Russ. Crimes (Ed. 1853) 13; Rosc. Cr. Ev. 953

Suggestions were made at the argument, that the rule in the state courts of this country is different. Our examination of the subject has brought us to a different conclusion. To the extent that our researches have been prosecuted, we find that the great majority of the well-considered cases decided in the law tribunals of the states conform in principle, and in some instances in the exact language employed, to the rule laid down in the first case cited from the English reports. As examples, we refer to the case of Freeman v. People, 4 Denio, 28, and to the case of Com. v. Rogers, 7 Metc. (Mass.) 501. In the former case, Beardsley, J., speaking for the whole court, said, where insanity is interposed as a defence to an indictment for an alleged crime, the inquiry is always brought down to the single question of a capacity to distinguish between right and wrong at the time when the act was done. In such cases, the jury should be instructed that it must be

clearly proved that, at the time of committing the act, the party was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong. Shaw, C. J., in the latter case said, in the very language employed in this instruction, that, although a person accused of crime may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences, if he has a knowledge that it is wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong, and receive punishment, such partial insanity is not sufficient to exempt him from responsibility for criminal acts. Many other cases of like import might be added to the list of citations, but we think it unnecessary, as those already given are sufficient to demonstrate the proposition, that the English and American rules, in the particular under consideration, are the same. This question is concisely but satisfactorily considered by Mr. Wharton, in his valuable treatise upon the Criminal Law, wherein he remarks to the effect that the courts of this country have not hesitated to apply the rule, that, to establish a defence on the ground of insanity, it must be clearly proved that, at the time of committing the act, the accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing wrong; and it is very doubtful whether our language affords the means of stating the proposition in a more satisfactory manner. Those who may desire to examine the cases more fully will find them collected by that learned author under the title appropriately designated as the one where the accused is incapable of distinguishing right from wrong, in reference to the particular act. Whart. Cr. Law, § 16. notes b, c, d.

All of the well-considered cases since 1843, in both countries, are founded upon the doctrine laid down by the fourteen judges, in the opinion delivered in the house of lords at that time. In the debate upon the question, Lord Brougham said, if the perpetrator knew what he was doing,—if he had taken the precaution to accomplish his purpose,—if he knew, at the time of doing the desperate act, that it was forbidden by the law, that was his test of sanity, and he cared not what judge had given another test, he should go to his grave in the belief that it was the real, sound, and consistent test. 1 Ben. & H. Lead. Cas. 94; Reg. v. Vaughan, 1 Cox, Cr. Cas. 80; Reg. v. Layton, 4 Cox, Cr. Cas. 149; Reg. v. Barton, 3 Cox, Cr. Cas. 275. This last case is more particularly applicable to another branch of the present inquiry, arising out of the complaint, that the court omitted to instruct the jury in accordance with the views presented

in the opening of the defence, and as enforced in the closing argument. In that case, the defence set up was, that the prisoner had committed the crime under an irresistible impulse. Parke, Baron, told the jury that there was but one question for their consideration, and that was, whether, at the time the prisoner inflicted the wounds that caused the death, he was in a state of mind to be made responsible for the crime. That would depend upon the question whether he, at the time, knew the nature and character of the deed he was committing, and if so, whether he knew he was doing wrong in so acting. In the course of his remarks to the jury he expressed his decided concurrence in the view of the question previously taken by Baron Rolfe, that the excuse of an irresistible impulse, coexisting with the full possession of the reasoning powers, if allowed to be a sufficient defence, might be urged in justification of every crime known to the law; for every man might be said, and truly, not to commit any crime except under the influence of some irresistible impulse. That distinguished judge then went on to say, that something more than this was necessary to justify an acquittal on the ground of insanity, and it would therefore be for the jury to say whether, taking into consideration all that the surgeon had said, which was entitled to great weight, the impulse under which the prisoner had committed this deed was one which altogether deprived him of knowledge that he was doing wrong. Reg. v. Stokes, 3 Car. & K. 185; Reg. v. Allnut, and Reg. v. Pate, 1 Ben. & H. Lead. Cas. 95, 96. Other cases to the same effect might be cited, but we think it unnecessary, as it was admitted at the argument that the two first named are regarded as sound law in the courts of the country where the decisions were made. Such undoubtedly is the fact, and in our view of the matter there is nothing in the opinion of the court in the case of Com. v. Rogers inconsistent with that state of the law. On the contrary, we think it is to the same effect, when the different paragraphs of the opinion are carefully compared with each other. In the first place, the learned judge lays down the doctrine that a person accused of crime is not to be excused from responsibility, if he had capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he was then doing, which is the rule, as before remarked, in all the well-considered cases upon the subject. He then stated the rule by which the jury were to be governed in case they found from the evidence that the accused was laboring under partial insanity.

That rule, it will be observed, is in the exact language of the instruction in this case, and was adopted by this court at the trial, for the reason that it was believed to be correct, and we are still of the same opinion. It does not authorize a jury to convict a person accused of crime, if laboring under partial in-

sanity, unless they find, from the evidence, that the accused, at the time he committed the act, still understood the nature and character of the act he was doing; that he still had a knowledge that the act was wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and to know that if he did the act he would do wrong and deserve punishment; and we hold, that when a man has capacity and reason sufficient to understand the nature and character of his act and its consequences, and knows that it is wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and deserve punishment. he is so far sane as to be responsible for his criminal acts; and on that state of facts, and when all those things concur,— which was the state of the case supposed in the instruction,—the law assumes that he has the power to refrain from doing the act, and does not acknowledge the doctrine that he may be impelled to commit it by any uncontrollable or irresistible impulse. Every person, on trial, under a criminal charge, is presumed to be sane and to possess a sufficient degree of reason to be responsible for his criminal acts, unless, as before remarked, the contrary is proved to the satisfaction of the jury; and whenever partial insanity is set up as an excuse for crime, the question, whether the degree of insanity is sufficient to constitute a valid defence, is for the consideration of the jury, whose province it is to determine the question, in view of all the evidence in the case; and if it appears from the evidence that the mind of the accused is merely clouded and weakened, but is not incapable of remembering, reasoning, and judging between right and wrong, in respect to his own particular act, that he still understands the nature and character of the act and its consequences and has a knowledge that it is wrong and criminal, and mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and deserve punishment, then the law, on that state of facts, properly regards the accused as a moral agent responsible for his criminal acts and punishable for the crime charged against him; and to admit, in such a case, that the defence may be successfully set up that he was impelled to the commission of the act charged by any uncontrollable or irresistible impulse would be to overlook and. disregard the test or criterion of responsibility for criminal acts which the law itself establishes in such a case, and to allow that defence to be urged in justification of every crime known to the law. For these reasons we are of the opinion that the instruction was correct, and that no further instruction in the case upon this subject was necessary.

A few remarks in relation to the twelfth cause assigned for a new trial will be sufficient to show that it is entirely without merit. It assumes that the court, in effect, instructed the jury that they could not acquit the prisoner on the ground of insanity, unless it appeared that his reason and mental powers were, at the time of the act, either so deficient that he had no will, no conscience or controlling mental power, or, that through the overwhelming violence of mental disease, his intellectual powers were for the time obliterated. Such portions of the charge as are supposed to be referred to in the motion for a new trial will furnish the most satisfactory answer to this ground of complaint. Upon this subject, the jury were told, in the first place, that insane delusion may and sometimes does exist to so high a degree that the person under its influence has neither intelligence nor capacity to have a criminal intent, but that such extreme cases were easily distinguishable from the examples of partial insanity, where the mind of the person is merely clouded and weakened, but is not incapable of remembering, reasoning, and judging, at the time, between right and wrong, in respect to his own particular acts. Another remark of the court in this connection was to the effect that extreme cases of insane delusion had doubtless occurred, where the reason and mental powers of the person were for the time wholly obliterated, so that he had no will, no conscience or controlling mental power, and consequently could not be regarded, in legal contemplation, as a moral agent, and that such persons would not be responsible for criminal acts. They were also told, upon the same subject, that if the testimony of the experts was correct, that form of insanity could not be successfully set up by the prisoner, as they appeared to negative that theory of his defence; but still, it was for them to determine whether there was any sufficient evidence in the case to support that view of the defence. Towards the close of the charge these propositions, together with some others of like importance, were re-stated to the jury in a more distinct form, in order to guard their minds against the danger of any mistake. They were then told, that if they found that the prisoner did not know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong, then he was clearly entitled to an acquittal.

With the same view they were also told, that a person was not criminally responsible if, at the time he committed the act, he had not sufficient capacity and reason to know whether his act was right or wrong, or, to speak more accurately, to know that the act he was doing was wrong and criminal, and would subject him to punishment; and also, that he was not responsible, if the act was actually done under a fixed insane delusion that certain facts existed which were wholly imaginary, but which, if true, would have constituted a good defence; and finally, that he was not responsible if he had not intelligence and capacity enough to have a criminal in-

tent, or if his reason and mental powers were, at that time, either so deficient that he had no will, no conscience, or controlling mental power, or, if through the overwhelming violence of mental disease, his intellectual power was for the time obliterated. Comment upon this part of the charge is unnecessary. It gives its own construction, and, as we think, affords a demonstration that the theory assumed in the motion for a new trial is erroneous.

All of the questions have been attentively considered, and, after full deliberation, we have come to the conclusion that it is our duty to overrule the motion; and there must be judgment on the verdict.