## JASON COFFEEN v. STATE.

No. A-3862.   Opinion Filed Oct. 9, 1922.
Rehearing Denied Dec. 2, 1922.
(210 Pac. 288.)

(Syllabus.)

1.   **Trial—Scope of Rebuttal Evidence—Moral Conceptions of Accused as Basis for Defense, of Emotional Insanity.**  Where one accused of the murder of his wife admits the killing and pleads temporary or emotional insanity caused by the discovery that his wife for weeks previous had been, and still was, sustaining illicit relations with another man, and where the testimony of the defendant tends to show that the defendant was a man of good moral character, respectable and respected in the community, and that up to this time his home had been pleasant, and that he had a high conception of the duties of a husband and the virtue of women, and that the discovery and knowledge of these illicit relations so preyed upon his sensitive mind, culminating in temporary insanity, during which he shot both offending parties, the state in rebuttal may, if it can, show that the defendant possessed no such exemplary character, but that the defendant himself was, or may have been, a libertine.

(a)  Such rebuttal testimony is permitted, not for the purpose of showing the truth of the facts proven, but to show the condition of the defendant's mind, to rebut the inference that the mental shock or strain was sufficiently great to unseat his reason.

(b)  Such proof may be made by showing specific acts and declarations, and not by evidence of general reputation.

2.   **Evidence—Insanity—Entire Demeanor Proper to Be Shown.**  When the insanity of a person is in issue, his conversations, acts, and declarations inconsistent with his sanity may be shown, and great latitude is allowed in the admission of such evidence. His entire conduct, including words spoken by him, the manner of his speech, and his appearance, may be introduced for the purpose of showing the condition of his mind.

Appeal from District Court, Garvin County; Frank Mathews, Assigned Judge.

Jason Coffeen was convicted of manslaughter in the first degree, and he appeals.  Affirmed.

J. T. Blanton, Thos. L. Farris, and Joe A. Edwards, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. On April 5, 1920, Jason Coffeen was placed on trial in the district court of Garvin county, charged with the murder of his wife, Mary Coffeen. He was convicted of manslaughter in the first degree, and by the verdict of the jury his punishment was fixed at confinement in the state penitentiary for a term of eight years.

This tragedy grew out of what, in current magazine literature, is termed the "eternal triangle." At the climax the defendant, on his own premises, shot his wife's alleged lover, Walter Rowland, and then shot his wife. Rowland recovered. The wife suffered almost instant death. The defendant for his defense interposed a plea of insanity.

Practically the only error urged is the alleged incompetency of certain testimony concerning the private life of the defendant, introduced by the state in rebuttal. To determine whether this was error it will be necessary to consider the features of evidence outlined below.

The testimony of numerous witnesses on the part of the defendant showed in a clearcut, positive manner:

That at the time of the tragedy the defendant was over 50 years of age. That he had resided in the town of Stratford, Okla., since the year 1912, and that during his residence there he was an active, prosperous business man, pleasant and sociable with his business associates and with his acquaintances. That for several years his family relations were pleasant, his family consisting of himself, his wife, and one son, 12 years of age at the time of the homicide. That he treated

his wife and son with kindness and consideration, and that they together attended church, public gatherings, and places of entertainment. That about 2 years prior to the commission of the crime charged defendant's wife took into their home a boy baby, 5 days old, whose mother had just died, and whose father was the man Rowland who afterwards became involved with defendant's wife. That when this baby was about 9 months old Rowland began to make frequent visits to the home of the defendant, occasionally remaining overnight with the family. That as time passed such visits became more and more frequent. That about 10 months prior to the homicide a young unmarried woman, about 20 years of age, was taken into defendant's home to assist the wife with the housework and the care of this baby. That during the time she was in this home she became pregnant, and that defendant insisted that she leave his home, but the wife insisted that she remain. That the father of the child afterwards born to this young woman was a son of Rowland, whose baby boy had been taken into defendant's home. That this young woman carried messages and letters to and from defendant's wife and her alleged lover, Rowland. That about 7 months prior to the commission of the crime charged the defendant found Rowland near the back porch, retreating from defendant's home, in the nighttime, with his shoes and most of his clothing in his hands. That Rowland was discovered by the defendant upon his arriving home unexpectedly and after he had broken in the the front door, which he found locked, and hurried through the house to the back porch. That the defendant then called in the roomers in the house, a young man and his wife, and stated to them, in the presence of his wife, what he had just discovered, and the wife admitted the truth of defendant's accusations, in the presence of these roomers. The defendant then, in a highly excited state of mind, went to the home of his business partner, where he related what had occurred. On

the following morning this business partner and his wife went to the home of the defendant, where the incidents of the night before were discussed in the presence of defendant's wife, who again admitted the truth of the charge made by the defendant.

That thereafter the defendant became nervous, irritable, and worried about his domestic affairs. That the discovery of his wife's infidelity was continually upon his mind, and that he constantly and persistently discussed his domestic affairs with his friends and neighbors, and even with strangers. That Rowland, a few days after this discovery, entered the home of the defendant, holding in his hands at the time a pair of cotton hooks. That an argument ensued wherein this man cursed and abused the defendant. That a short time thereafter the defendant caused Rowland's arrest for the purpose of having him placed under a peace bond. That at the hearing it developed that it was the only desire of the defendant that this man remain away from the defendant's home and cease to interfere further between his wife and him. By mutual agreement further proceedings to keep the peace were abandoned. Notwithstanding this, for a period of several months, Rowland continued to visit frequently in the home of the defendant in the latter's absence. That on two or more occasions he was found lurking in the alley back of defendant's house in the nighttime, endeavoring to conceal his presence. Defendant insisted that Rowland's child be returned to Rowland, and tried to get his wife's consent to selling the home and move to some other place where they owned property, in order to prevent further visits from this man. The wife, however, refused to give her consent to the sale of the home and refused to remove from the town where they resided, or to return the child to his father. That about this time the defendant and his wife, although living under the same roof, occupied sep-

arate rooms, and that the wife, with financial aid furnished by Rowland, took steps to procure a divorce from the defendant. Finally defendant caused to be served upon Rowland a written notice demanding that he take his child from the home of the defendant. Pursuant to this notice the child was removed, but a few days later was placed in the home of a neighbor living just across the street from defendant's home.

About 15 days prior to the commission of the homicide the defendant and his wife went by rail from their home to a town about 85 miles distant. At a railroad junction they remained overnight, registered at a hotel as man and wife, and occupied a single room. While there at this hotel the defendant and his wife agreed to reconcile their differences, and the wife agreed to cease associating with Rowland. The defendant then returned home, and his wife resumed her journey up into Kansas. About the time the defendant expected his wife home, as indicated by a postal card received from her, Rowland made a trip to Chickasha, through which town the wife would pass on her return home. The defendant later found out that Rowland and defendant's wife had been in Chickasha the same night. This occurrence, which took place about a week prior to the killing, again aroused the suspicions of the defendant and aggravated the defendant's apparent eccentricities and irrational conduct. He would relate to his friends and acquaintances his troubles for hours at a time. He would repeat and rehearse his statements to the same person over and over. Witnesses stated that about this time the eyes of the defendant took on a glassy stare, that he became totally indifferent to his business, which he had been neglecting since the trouble began, that he suffered lapses of memory and sometimes seemed unconscious of what was said to him by his friends, and that much of the time he would walk to and fro on the streets of

the town, abruptly changing his course without any apparent cause, that he was seen frequently about the streets late at night, traveling up and down, and that he suffered loss of appetite, and became weak, anemic, and dispirited.

That on the morning of the tragedy defendant was particularly nervous, having spent several hours pacing up and down the sidewalk in front of and about his premises; that some one had communicated to him that Rowland was bringing his child that day to the home of the neighbor across the street, and that defendant had told his business partner that he feared Rowland would make further attempts to visit defendant's wife. That about 12 o'clock Rowland appeared on horseback with the child and left it with the neighbor, and then rode out in the street diagonally towards the defendant, who was standing on the sidewalk in front of his residence. That the defendant thereupon drew his gun and fired three shots at Rowland, who leaned forward in his saddle and galloped off down the street. One of these shots penetrated Rowland's hip, from the effects of which wound he later recovered. After firing at Rowland, defendant turned and ran into the house, where he found his wife rapidly ascending the stairs. He brushed aside his 12 year old son and fired two shots at his wife, one of which entered her back, killing her instantly. After the tragedy the defendant acted cool and collected until an officer came and placed him under arrest.

Forty-six witnesses testified in behalf of the defendant, most of them his neighbors and acquaintances, nonexpert witnesses. Many of these testified concerning his mental state at and prior to the time of the tragedy. Based upon his actions and conduct, as recited by these various witnesses in detail, their conclusions were as follows, to use their own expressions:

"He paced around like he was unbalanced;" "impressed me as being irrational;" "didn't seem to be at himself;" "looked frustrated and had a wild look in his eyes;" "seemed like he was in bad trouble;" "acted peculiar;" "acted like he was under a deep strain;" "his maneuvers indicated he was bothered;" "seemed to be in an excited state of mind, worried;" "not fit to transact business;" "acted like an insane or drunk man;" "would look at you with a stare and would not answer;" "kind of rattlesome, not normal;" "fidgety, excitable;" "acted unusual, acted very insane;" "was not balanced, cog loose;" "acted very irrational."

Others testified to the same general import. The late Dr. Duke, of Guthrie, who qualified as an expert, stated in substance that in his opinion the defendant was insane and irresponsible at the time of the homicide and for some time previous.

A number of neighbors and acquaintances of the defendant, nonexpert witnesses, testified on behalf of the state concerning the conduct of the defendant at and for some time prior to the homicide. Based on such conduct, some of their deductions were as follows:

"His eyes would glare as if it made him mad;" "he wasn't insane if I am any judge;" "I would say he was sane;" "of course he was mad; didn't impress me as being crazy;" "seemed all right to me;" "seemed to be absolutely sane;" "seemed rational."

If all the facts in detail were arranged and related by a skillful writer, this would make an interesting story; but that is foreign to the legitimate function of a judicial opinion. To determine the issues here, we deem it sufficient to state that the testimony on the part of a great number of witnesses tended to show that the defendant stood well socially and financially in his home town; that he was a respectable and respected citizen there; that until Rowland interfered with defendant's home relations his home life had been ideal; that

he had been a good provider and a faithful, affectionate husband; that he had high ideals of home and the chastity of women; and that when he discovered his wife's perfidy and unfaithfulness, coupled with her refusal to break and discontinue her relations with Rowland, he suffered constant mental anguish and humiliation that culminated in dethroning his reason to such an extent as to render him mentally irresponsible for his acts in connection with the fatal tragedy.

This showing was to some extent, particularly as to defendant's state of mind, controverted by the testimony of several witnesses for the state. Moreover, to controvert the showing of the defendant that the intensity of the mental shock produced upon him by his wife's infidelity and perfidy of his neighbor was such as to unseat his reason, the state, over the objections of the defendant, sought to prove, and in a measure did prove, specific conduct tending to show that the defendant himself may have been a rounder and a libertine. Facts were shown indicating that defendant's ideals of the sanctity of the home and the virtue of women were not so exalted as shown by defendant's testimony, and that therefore the shock to his mind and finer sensibilities could not be so very great—at least not so great as to unbalance his mind.

The defendant claims that this class of testimony was incompetent and highly prejudicial. On this question we concede that, if this class of testimony was incompetent, it was highly prejudicial. The competency and relevancy of this kind of testimony under the circumstances here, it seems to us, is a mixed question of mental philosophy and law. In dealing with the philosophy of sex emotions there is danger of drifting into boundless uncertainties of theoretical speculation. With this danger in mind we will endeavor to keep within the bounds of reason. Suppose it had been shown that this defendant was a moral degenerate, in the habit of con-

sorting with prostitutes and dissolute women; and that in the course of events he married one of them, who subsequently proved unfaithful to him; would it be likely that his discovery of her unfaithfulness would cause him to lose his mind and drive him insane? We think, in reason, that the shock would, not be so great as it would to a man of refined sensibilities, having high conceptions of the sanctity of the home and the virtue of women.

We have not been able to find an adjudicated case deciding this exact question, but there are authorities in which the principle here involved has been applied in a general way to specific acts of alleged insane persons. Wigmore on Evidence, vol. 1, § 228, says:

"Sanity and insanity are terms applicable to the mode of operation of the mind as judged by some accepted standard of normality. The mode of operation of the mind is ascertainable from the conduct of the person in question; i.e.; from the effect produced by his surroundings on his mind when responding by action to those surroundings. Virtually, then, the mind is one, while the surroundings are multifold; and the mode of operation cannot be ascertained to be normal or abnormal except by watching the effects through a multifold series of causes. On the one hand, no single act can be of itself decisive; while, on the other hand, any act whatever may be significant to some extent. The first and fundamental rule, then, will be that any and all conduct of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue. 'Upon this I believe that no difference of opinion will be found to exist,' said Mr. Justice Patteson, in a celebrated case, 'as to the principle upon which such evidence is admissible. Every act of the party's life is relevant to the issue. There can be no escape from this consequence. There is no distinction in kind (whatever there may be in degree) between one or another piece of conduct as evidence to be considered; some inference

is always possible.' On the general principle of relevancy any piece of conduct offered as indicating insanity may be explained away as equally or more consistent with sanity.''

Now, if the defendant be permitted to show that he possessed a highly sensitive moral mind and that some great shock probably brought on emotional insanity, why may not the state show, if it can, that the accused possessed no such character by showing that he had perverted sexual propensities, and that his moral sensibilities were blunted to such an extent as to make it improbable that the shock disturbed his mental equilibrium? In an early case decided in the United States Circuit Court, U. S. v. Holmes, 1 Cliff. 98, Fed. Cas. No. 15,382, Associate Justice Clifford of the United States Supreme Court said:

''Whenever * * * the accused'' has offered his acts, conduct and declarations before and after the homicide, ''the government may offer evidence of other acts, conduct and declarations of the accused within the same period to show that he was sane, and to rebut the evidence introduced for the defense.''

This same principle is announced in volume 1 of Clevenger's Medical Jurisprudence, p. 498:

''And where acts, conduct, and declarations of the accused are introduced to prove the insanity of a person at the time of the commission of the act, the prosecution in rebuttal is not limited to an explanation or denial thereof, but may offer evidence of other acts, conduct, or declarations (or circumstances) tending to show his sanity within the same period, and such evidence is not objectionable as an attack upon his character.''

When the insanity of a person is in issue, his conversations, acts, and declarations inconsistent with his sanity may be shown, and great latitude is allowed in the admission of such evidence. On the issue of insanity of one accused of

crime evidence of his entire conduct, including words spoken by him, the manner of his speech, and appearance, may be introduced, not for the purpose of showing the truth of the facts proven, but to show the condition of his mind. Such proof may be made by showing specific acts, declarations, and conduct, and not by evidence of general reputation. Any evidence of this character that tends to explain the issue is admissible. 14 R. C. L. 617.

The practice of determining the issue of insanity in this state is in keeping with the declarations just made. Section 4572, R. L. 1910, among many other things, provides that upon this issue the peculiarities of temper, habits, disposition, pursuits, passion, religious impressions, and other matters having a bearing on the case may be inquired into.

Touching upon the admissibility of this class of testimony, Chief Justice Burford, in Turner v. Territory, 11 Okla. 660, 69 Pac. 804, said:

"If the testimony tends in the least degree to support the defense of insanity at the time of the commission of the act, it is error to exclude it from the consideration of the jury. It is not every peculiarity of manner or speech that is the result of insanity; some persons in their normal state of mind have peculiar manners, unusual customs, and make use of strange and extraordinary expressions. It is only when the peculiarities of speech and conduct indicate a change in the usual and ordinary manners and language of the particular individual that mental unsoundness may be inferred."

The case of Tingley v. State, 16 Okla. Cr. 639, 184 Pac. 599, was a case in which the defendant testified that he believed that the deceased and his (defendant's) wife were intimate, that the deceased had invaded his home, and that partly by reason of such conduct defendant's reason was temporarily dethroned. The state, to rebut any presumption of insanity arising from such belief, introduced testimony tend-

ing to show that the defendant had failed to keep his own life pure and did not have so high a regard for the sanctity of the home as would cause the discovery of a wife's infidelity to dethrone the reason of a pure man. The court held that, whether this evidence was or was not proper rebuttal evidence, it was not prejudicial under the circumstances in that case, and stated that the question of whether it was proper rebuttal evidence was not necessary to a decision of that case, and, except inferentially, announced no rule of evidence governing such a situation.

Since all the authorities hold that evidence in chief of specific facts and conduct showing that the accused may have been insane at the time of the commission of a homicide is admissible, we think there is no good reason why the state may not show facts and circumstances which tend in any way to rebut this inference. We hold, therefore, that under the peculiar circumstances here the court did not abuse his discretion in permitting the state to introduce evidence in rebuttal tending to show that the defendant's social life was not exemplary and in submitting it to the jury under the instructions given, for the purpose of counteracting the inference raised by defendant to the effect that the shock to his sensitive, refined, mind caused him to become temporarily insane, culminating in the homicide charged. There was ample evidence to support the verdict.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.