(37 South. 890.)

No. 15,275.

STATE v. LYONS.*

(Dec. 19, 1904.)

CRIMINAL LAW — OPINION EVIDENCE — STATE-
MENTS OF ACCUSED—PRIVILEGED COMMUNICA-
TIONS—EXAMINATION OF WITNESSES — MUR-
DER—INSANITY AS A DEFENSE—EXPERT TES-
TIMONY — INSTRUCTIONS — CREDIBILITY OF
WITNESSES—INSANITY AFTER CONVICTION.

1. It is not necessary that a witness in a prosecution for murder should have qualified as a medical expert in order that he may be heard to testify as to the passage of a bullet through the heart and liver of the deceased, where it appears that he assisted in the autopsy, is giving the result of his personal observation, and is able to identify the organs mentioned, as such, from having seen them taken from the body of the deceased.

2. A person under arrest upon a criminal charge is not obliged to answer questions, but he may do so if he thinks proper, and the mere fact that he answers or makes statements whilst under arrest does not necessitate the exclusion of such answers or statements as evidence on the trial.

3. It does not follow, because a physician visits a person with whom he is acquainted. and who, being charged with murder, is lying in a hospital, under treatment for a wound, that such visit is paid in a professional capacity, or that the relation of physician and patient is thereby established between them.

4. A state witness having been asked on cross-examination whether the accused was under the influence of opiates at a particular time, the objection to a similar question propounded by the district attorney on redirect examination, that the witness had not qualified as an expert, was properly overruled.

5. If a question, though leading, leads to nothing to the prejudice of the accused, there is no good ground of complaint on his part.

6. A witness upon redirect examination may be asked to explain what he intended to convey by answers given on cross-examination.

7. Where a witness who, as a member of a coroner's jury, has participated in an autopsy, and in a finding, which bears his signature, as to the cause of death, is asked what, as a member of such jury, he had found to be the cause of death, there is no prejudicial error in admitting his answer, when it appears that he immediately thereafter identified his signature to the written instrument containing such finding, and that the same was read to the jury without objection, and it does not appear that there was any va-

*Rehearing denied January 30, 1905.

riance between the answer of the witness and the finding contained in the instrument.

8. A witness for the defense, being asked on cross-examination, "Did you not make the statement?" etc., the objection that the state was attempting to contradict or impeach the witness, and should state time, place, and person, is premature, as based upon an unauthorized assumption as to the future purpose of the state.

9. Where, in a prosecution for murder, in which insanity is set up as a defense, a nonexpert witness, after testifying that he had conversations with the accused, is asked, "Did he say anything that was irrational?" the question does not call for an expression of opinion as to whether the accused was sane or insane, since an insane man may at times talk rationally, and a sane one irrationally.

10. In a prosecution for murder, where the defense is insanity, the opinions of nonexpert witnesses, sworn in rebuttal, to prove or maintain the presumed sanity of the accused, should be received in evidence where it appears that the witnesses are persons of normal intelligence, and that they have had adequate opportunity, considered with reference to the scope of the opinions sought to be elicited, to observe the conduct of the person whose mental condition is the subject of investigation; the determination of the question of intelligence and of adequacy of opportunity being largely within the discretion of the trial judge.

11. On the issue of insanity, in a prosecution for murder, testimony as to the conduct of the accused both before and after, as well as at the time of, the act charged, is competent, and should go to the jury.

12. Where the defendant, charged with murder, introduces the testimony of an expert oculist to show that he was suffering from a disease of the optic nerve, which, in the opinion of the witness, probably resulted from cerebral irritation, and indicated that he was a dangerous man, the objection that another expert oculist, sworn on behalf of the state in rebuttal, had not qualified as an expert alienist, is properly overruled; the immediate question at issue being the pathology of a disease of the optic nerve, concerning which the qualifications of both witnesses were conceded.

13. Defendant, on trial for murder, having offered testimony to prove that up to a certain time he had been quiet, peaceable, gentle, kind, etc., the objection that the state should not be permitted to prove particular instances of violence within the time in question, but should be confined to proof of general reputation, was properly overruled.

14. Whether a witness on redirect examination may be questioned upon a matter not touched upon in the cross-examination is within the discretion of the trial judge.

15. Where an unguarded remark of a juror, indicating no prejudice against the accused, is brought to the attention of the court, and the

court cautions the jury and the juror with reference to it, the failure of the court, when so requested by defendant's counsel, to inquire of the jury whether their minds have been prejudiced, affords no ground for setting aside the verdict.

16. The charge, given by the trial judge to the jury, that, where insanity is set up as a defense in a prosecution for murder, it must be established by the defendant to the satisfaction of the jury, by a preponderance of the whole evidence in the case, conforms to the jurisprudence of this court, and is sustained.

17. The accused, being prosecuted for murder, set up insanity as his defense. The trial judge instructed the jury, in substance, that, in order to convict him, they must find not only that he knew the nature and quality of the act charged, at the time of its commission, and knew that it was wrong, but that he was mentally capable of choosing whether to commit it or not, and of governing his conduct by such choice, and that he should be acquitted if they found that, though he committed such act, knowing its nature and knowing it to be wrong, they also found that he was impelled thereto by the irresistible impulse of a lunatic, and not the passionate impulse of a sane man ; and he further instructed the jury that insane delusion excuses an act otherwise criminal, when the delusion was such that the person under its influence firmly believed in the existence of some imagined fact or condition, which, if existent, would have excused such act, as when the belief was that the party killed had an immediate design on his life, and under that belief the insane man killed his supposed enemy in supposed self-defense, but that if the delusion was that the party killed had acted injuriously towards the slayer, or had committed any act which did not expose the life of the latter to imminent danger or subject his person to great bodily harm, it would not justify or excuse the killing. Counsel for defendant requested the additional charge that "if the jury believes from the evidence that the defendant insanely believed at the time of the commission of the act either that the imagined evil was so intolerable as to make life-taking necessary or justifiable in order to avert it, or that life-taking was an appropriate and just way of getting rid of it, he is entitled to be acquitted." *Hcld,* that the requested charge was properly refused, being calculated to mislead the jury.

18. The doctrine of moral insanity, which consists of irresistible impulse coexistent with mental sanity, has no support either in psychology or law.

19. The jury are the sole judges of the credibility of witnesses, and it is not error for the judge to instruct them that they may accept or reject expert testimony, as they may accept or reject any other testimony.

20. Where a defendant charged with murder has been convicted in a trial in which the question of insanity vel non was the main issue,

and it is suggested, in arrest of judgment, that "he is not now of sane mind," the method of inquiry to be pursued is entirely within the discretion of the presiding judge, and his refusal to order a trial by a jury is not a denial of due process of law.

(Syllabus by the Court.)

Appeal from Criminal District Court, Parish of Orleans; Frank D. Chrétien, Judge.

Lewis W. Lyons was convicted of murder, and appeals. Affirmed.

Joseph Edward Generelly and Warren Doyle, for appellant. Walter Guion, Atty. Gen., Chandler Clement Luzenberg, Dist. Atty., Samuel A. Montgomery, Asst. Dist. Atty., and Henry Mooney, Asst. Dist. Atty., for the State.

MONROE, J. Defendant, having been convicted of murder and sentenced to death, has appealed, and presents his case to this court by means of certain bills of exception, which will now be considered in connection with the testimony or other matter to which they refer:

Bills 1, 2, 3. A witness for the state was asked: "Where were the wounds? Where did the other bullet enter? Turn around and show the jury, so that they can see you. Did you see whether any of those bullets perforated in its course any organs of the body?"—to which it was objected that the witness had not been qualified as an expert, that he was not a physician, that his testimony would necessarily be hearsay, and that the proof should have been made by the coroner.

The witness was the coroner's clerk, and is shown to have been present at, and to have assisted in, the autopsy. He was asked to testify only to facts, knowledge of which he had acquired by his own inspection of the body, heart, and liver of the deceased.

He needed no qualification as an expert for the purposes of such testimony, nor does it affect his competency as a witness that

he was unable to say whether he could distinguish the liver of a human being from that of a calf, since a witness who sees that organ taken from a human body may identify it, though he might not, where both had previously been separated from the bodies to which they had belonged, be able to distinguish it from that of a calf. Wharton, Cr. Ev. §§ 160, 360; Underhill on Cr. Ev. § 39; State v. Smith, 22 La. Ann. 468. The objection was properly overruled.

Bill 4. The same witness was asked, "Just answer this question, yes, or no: Was anything said to him [the accused], or did he say anything to any one, in your presence?" to which it was objected "that the accused was then under arrest, and was not required to answer any questions or make reply to any accusation brought against him." The accused was not required to answer questions, but was at liberty to do so if he thought proper. State v. Jones, 47 La. Ann. 1524, 18 South. 515; State v. Lewis, 112 La. 872, 36 South. 788. The objection was properly overruled.

Bills 5, 7, and 11 show that the same witness and another were asked, in substance, "Now, state what this man said to Dr. Richard, and what Dr. Richard said to this man?" to which it was objected that Dr. Richard appeared at the bedside of the accused as a physician, questioned him as such, asked about his wounds, and whatever communications took place between them were privileged.

The accused had been taken after the homicide to the Charity Hospital, where he was under the treatment of the surgical staff of that institution. Dr. Richard was the coroner, and presumably a physician and surgeon. He was acquainted with the defendant, and visited him on a particular occasion whilst the latter was in the hospital; but it does not appear that he paid such visit, or any other, in the capacity of physician or surgeon, or that he ever occupied

that relation towards the accused. The objection was therefore inapplicable to the facts, and was properly overruled. Whether it would have made any difference, under our law, if Dr. Richard had been the attending physician, need not be considered.

Bills 6 and 8 show that upon redirect examination this question, in substance, was propounded to the same witness and to another: "You were asked if you knew whether this man was under the influence of opiates or drugs. Did the man appear to be perfectly rational when he [referring to Dr. Richard] spoke to him, or did he appear to be under the influence of drugs?"—to which it was objected that the witness was not an expert, and was not qualified as such.

The counsel for defendant having asked upon cross-examination, "Do you know whether this man was under the influence of opiates or drugs while out at the hospital?" and the witness having answered, "Well, I couldn't say; I don't know," the questions objected to were competent, in order to give him an opportunity to amplify and explain his answer so made. 1 Greenleaf (16th Ed.) § 467; Underhill on Cr. Ev. p. 209; Wharton on Cr. Ev. § 460. And the objection was properly overruled.

Bill 9. Upon redirect examination a witness for the state was asked, "There was more to it—instead of telling you a few words, he had a conversation with you?" to which it was objected that the question was leading. It is enough to say, concerning this objection, that, if leading, the question objected to led to nothing that had not been developed on the cross-examination or that could have prejudiced the accused. And there was no reversible error in the ruling complained of.

Bill 10. Upon redirect examination a witness for the state was asked, "Did you ever intend to say that this man was insane to the extent of not knowing the difference between right and wrong?" to which it was

objected that the language of the witness spoke for itself, and that the question was leading. The witness had been cross-examined at considerable length concerning interviews between him and other persons immediately after the homicide, in which he was reported to have stated that the accused was "mentally unbalanced, a monomaniac, insane, crazy," etc., and he had testified that he had, perhaps, used such language, but that the deceased, his intimate friend and partner, had just been killed; that he had just seen the defendant weltering in his own blood from a self-inflicted wound; and that he was laboring under considerable excitement, and had spoken somewhat loosely; the substance of his testimony, as given on the cross-examination, being that he had not, in the interviews mentioned, intended to convey the idea that the accused was insane in the technical sense of that term, or legally irresponsible. Thus, in concluding one of his answers, he had said: "I know the idea I intended to convey was that he was cranky, and not crazy, within the meaning of the law." The question objected to could therefore have developed nothing more, and in fact developed nothing more, than had already been elicited by defendant's counsel, and there was no reversible error in the ruling complained of.

Bill 12. A witness for the state was asked, "What did you find was the cause of his death?" to which it was objected that the witness was not an expert, and could testify only to what he had been told by the coroner, and that the procès verbal of the coroner's jury was the best evidence. No answer was given to the question as propounded, and, after the objection had been made and overruled, the following question was substituted, to wit: "* * * What did you find, as a member of the coroner's jury, as to the death of Mr. Gurley?" It will thus be observed that the witness was called on to testify not as to what, in point of fact, was the cause of the death, but as to what, as a member of the coroner's jury, he had found to have been the cause of death, and to the question as finally propounded no objection was made. Assuming, however, that the objection as previously made was intended to apply, the answer required no expert knowledge, nor was the witness obliged to rely upon information obtained from the coroner in order to answer it. The procès verbal was perhaps the best evidence of the action taken by the coroner's jury, but as the testimony brought up in connection with this bill shows that it was presented to the witness, who verified his signature thereto, and was then, without objection, read to the jury, and as it is not suggested that the answer of the witness was at variance with its contents, it is evident that the defendant could not have been prejudiced by reason of such answer. Beyond this, the cause of death does not appear to have been a serious issue in the case, the defense relied on being the insanity of the defendant. We therefore find no reversible error in the ruling complained of.

Bill 13. A witness for the defense, being cross-examined by the district attorney, was asked, "Didn't you make the statement that you had a party fence alongside of his [accused's] place or lot, and that the man worried you so much that you had to give up the lot, because of his malicious ways?" to which it was objected "that the state was attempting to contradict the witness, and must state the time, place, and person to whom the statement was made." The objection was based upon an assumption which does not appear to have been supported by the fact, since it is not suggested that the state thereafter made any attempt to contradict or impeach the witness, and was properly overruled, as premature.

The following bills, to wit, Nos. 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 31, 33, and 34, involve the same question of law,

which will be considered after the facts disclosed by such bills, respectively, have been stated.

Bill 14. Dr. Dana, first assistant house surgeon, Charity Hospital, attended accused in that institution in July, 1903, immediately after the homicide, for a gunshot wound in the head. Visited him at least twice a day. Spoke to him on each occasion. Asked him how he felt—whether he was suffering. Occasionally tested his sight by asking whether he could see with right or left eye. Accused answered questions after the first day. Witness did not remember other conversations, or to have heard accused say anything else. Witness was asked: "Q. Did he at any time during the time that you spoke to him say anything at all which was irrational? (Objection. Overruled.) A. No, sir."

Bill 15. Dud Sneed, newspaper reporter, saw accused once or twice in hospital, and subsequently, 15 or 16 times, in prison (witness having been assigned to that duty). Spoke to him each time. Tried to get him to talk and make a statement of his case, but accused would not talk about his case. Said he did not want to do so. He talked about employing a lawyer. Said he didn't have money enough to pay as much as a certain lawyer (naming him) wanted, and that he didn't think he ought to call on his family for money. Witness asked him how he felt, and talked about anything that would be likely to draw him out. "Q. Did he, during all this time that you spoke to him, * * * say anything that was irrational? (Objection. Overruled.) A. He never said anything that I regarded as irrational." Witness further testified that he usually found accused either lying on or sitting by his bed or by the window, looking into the prison yard, and that none of his actions appeared irrational.

Bill 17. George Redell had known accused about 10 years. Had talked to him occasionally. Last occasion, about four years pre-

viously. Talked politics—about Jacksonians and Regulars. "Q. Did he ever say anything to you, in any of his conversations, which appeared as though it was irrational, or that he was out of his mind? (Objection and ruling.) Q. At that time that you saw him, did you consider him perfectly sane? A. Oh, well, I couldn't prove that. Q. Why? A. I never saw him often enough."

Bill 18. Same witness was asked: "Did you ever have any trouble with him?" to which it was objected that defendant's reputation for peace and quietness was not at issue, and could not be proved by particular instances.

"Per Curiam: The question at issue was the crime of murder, the defense to which was insanity. On the question of insanity, the whole life of the defendant, his peculiarities, temper, disposition, acts, sayings, etc., are subject to investigation. It is by means of all these conditions, circumstances, etc., that the question of insanity is determined. But aside from this, the defendant had already offered evidence to prove his good character, exemplary conduct, peaceful behavior, exemplary life, up to 1895. It was proper for the state to rebut this evidence by contradictory facts and occurrences, and, as rebutting testimony, it was admissible, and admitted."

The district attorney also states on the face of the bill that:

"* * * There was evidence on the part of the defense to show that up to the year 1895, in which year the defendant had been wrongly charged with the theft of a diamond stud, the defendant had, from childhood, led an exemplary life, and he was, from childhood, quiet, peaceful, gentle, kind, affectionate, industrious, and sociable—an affectionate son, brother, husband, and father; that after his arrest his character completely changed. The prosecution asked this question to show that his character was not as the defense had stated his character to be."

The witness answered that the defendant had on one occasion attacked him without provocation of any kind. He was then asked, "Don't you think this was a crazy sort of an act, to knock you down?" to which he replied, "Well, it was, in one sense."

Bill 19. James O'Malley had known accused about 10 years. Lived in same square. Was quite intimate at one time. Talked to

him very often for a few years on numerous subjects. Had last seen him during presidential election—McKinley. They were clerks in the same booth, on same side. "Q. From what you have seen of him, his actions, and his conversations, did you come to any conclusion as to whether he was sane or insane? (Objection. Overruled.) A. Well, nothing that would lead me to believe that he was insane."

Bill 20. J. W. Tray had known accused for about 15 years, and was friendly with him. During twelve years had talked with him about 20 times. During 3 years immediately preceding the homicide had talked to him about twice. Talked on the topics of the day, and met him in business and talked to him. "Q. Did you ever hear him say or do anything irrational? (Objection. Overruled.) A. No, sir."

Bill 21. Mrs. Lena Heffner: Accused had roomed at her house about 10 months immediately preceding the homicide. Had room adjoining that occupied by witness, with folding doors between. He never disturbed witness by walking at night. He made no unusual noise. He did not sleep with a light in his room. He was very quiet and neat. He was in his room all day on the Sunday preceding the homicide, very quiet, reading the papers. Witness had occasional conversations with him. "Q. In any of those conversations, Mrs. Heffner, did he ever say anything which was irrational? * * * Did he ever say anything which appeared to you insane?" (Usual objection and ruling.) Witness answered the first question in the negative; and the second, that she could not remember. Between the questions, which were not propounded together, as they appear in the bill, and after the second question, the witness stated that she visited the accused in prison once or twice, and asked him why he got himself in such trouble, and that he replied that "he was a man that, when he made up his mind to do anything, he always did it, and that it was all right."

Bill 22. E. F. Baker, druggist, parish prison, had known accused since his imprisonment, a period of three months. Had spoken to him every day about his medicine and food and about other matters.

In the stenographer's notes we find the following:

"Q. You say he never at any time said anything irrational? A. No, sir. Q. Has he ever, in your presence, committed any irrational acts? A. No, sir. Q. From what you have seen of him, and the conversations you have had with him, do you consider him sane or insane? A. Sane."

It may be remarked that the stenographer's notes, in this instance and in several others, fail to disclose the objection mentioned in the bills. From the bill it appears that the witness was asked: "Did he ever say anything to you which was irrational? Has he ever, in your presence, committed any irrational act?"—to which it was objected that the witness could give his opinion only after stating facts and giving reasons. After the questions and answers as given above from the stenographer's notes, the witness stated that the accused was very orderly and neat, and on cross-examination he recalled one conversation with him, held a few days before, to which he testifies as follows:

"They were just serving dinner, about dinner time, and they put two pieces of bread down in front of him—of Mr. Lyons—and I said, 'Mr. Lyons, are you going to get away with all that?' and he said, 'Oh, they used to send me good bread when I was in the hospital, but now it is regular punk.' Q. You spoke about the bread? A. Yes, sir. Q. What was the conversation about the prisoners? A. Well, we were speaking about a man who was in the hospital with him, trying to find out something about his condition, and I said it was a waste of time to talk to him, and he said, 'Yes, you will waste your time on him.' Q. What did you have to say about medicines? A. Well, when he would need anything he would ask me to get it."

Witness further testified that accused complained of pain in his chest and back, and

that he gave him liniment, and that he complained about people coming to see him, and said that he did not like to see them.

Bill 23. George McIntire had known accused 15 or 18 years. Had seen him a few days before the homicide, and had taken a drink with him. Had seen him two or three years before that. Accused would come to witness' shop to get shaved, and would invite witness to drink. This was occasionally, once in two or three months. He didn't have much to say, but witness always found him pleasant and sociable. "Q. At any time when he came into your shop or took drinks with you, did he say or do anything which made you think he was insane? (Objection and ruling.) A. No, sir." On recross-examination, the witness said, "I have taken many drinks with him."

Bill 24. Fitzsimmons, bartender at Continental Saloon, had known accused about 18 months immediately preceding the homicide. He frequented the saloon. Was there nearly every day. Would come in about 9 o'clock in the morning and stay awhile, then go off and get breakfast, and come later in the evening, and would perhaps play cards or dominoes, and stay until the saloon closed, at 11 p. m. Witness spoke to him when he saw him. Played one or two games of cards with him. Heard him talk to others. "Q. Did this man at any time ever say anything which appeared to you irrational? (Objection and ruling.) A. No, sir; I could not say that." On redirect examination the witness testified that sometimes, when discussions and friendly disputes arose among the patrons of the saloon, Lyons, if there, would be called on to decide them, and that they generally got a just decision; "that he was looked upon as a man who would give a just conclusion."

Bill 26. Dr. J. B. Guthrie, practitioner of medicine, connected with Charity Hospital, and visits the Louisiana Retreat (an asylum for the insane) in the absence of Dr. Fortier:

Saw the accused several times in the hospital, and talked to him once or twice to probe his mental condition. He was very reticent, and resented questions, and the conversations were not productive of much information, save that he negatively answered rationally. Said that he did not see that his private affairs concerned the witness. "Q. The little you saw of him, were you able to form your conclusion as to his sanity or insanity?" The question was here raised as to whether the witness was offered as an expert or nonexpert, and seems to have been decided to the latter effect, whereupon, according to the bill, though there is no evidence of it in the stenographer's notes, the usual objection was made. The district attorney then asked: "I am only speaking of what you saw of him. You say you tried to probe his mind? A. From what I saw, there was absolutely no evidence of insanity."

Bill 27. Albert Anderson had known accused for about three years. Had seen him about every second or third day at Turf Exchange and Continental Saloon, and had talked to him. Never spoke to him about Mr. Gurley. "Q. Did you ever hear this man say anything that appeared irrational? (Objection and ruling.) A. No, sir."

Bill 28. W. H. Harris, contractor, had known accused about six months, and had talked to him at different places quite often —nearly every day. Talked about subleasing a contract—contract F, in sewerage work; as to what money could be made; as to whether accused could get money to start with. Accused said he could get the money. "Q. In all your conversations with this man, talking with him, seeing him every day, at any time did he say anything to you which appeared irrational? When you knew him, talked to him, and saw him, did you consider him sane or insane?" (Usual objection and ruling.) Witness answered in the negative.

Bill 29. Trezevant, assessor, had known accused about 16 years. Had conversations

with him, off and on. Requested to mention one, he replied:

"Well, I have spoken to him of different things. One day, going downtown in the car, we met, and I had a conversation with him on different things. I asked him at the time why he was in opposition to me, and he said that he went with the man that give him the most stuff. Q. Did this man ever say anything to you which was irrational? (Usual objection and ruling.) A. Not to my knowledge. I always considered him a bright, smart chap."

Bill 30. Charles Hagen, proprietor Continental Saloon, had known accused about 18 months. He frequented the saloon "mostly every day," passing his time playing checkers or cards. Witness had conversations with him on unimportant matters. "Q. At any time during these different conversations did he ever say or do anything that made you doubt his sanity? Did he ever do anything that made you think he was insane? (Objection and ruling.) A. He seemed to be troubled about something. I think it was family troubles, but I don't think he was insane."

Bill 31. T. R. Gaughan, bookkeeper in a bank, had known accused for 10 or 12 years. Had conversations with him. Talked about Mr. Gurley, the deceased. Does not think he ever said anything irrational. Witness considered him sane. Witness, together with another person, at the request of accused, called on Mr. Gurley. Witness had submitted to him by accused a lot of papers purporting to be his (accused's) view of a matter concerning which he had had a difference with Mr. Gurley, and accused said that, if they (witness and the other friend) decided in his favor, Gurley would pay him some money. After calling on Gurley, witness concluded that accused was wrong, and told him so. The statement contained in the papers was clear enough to enable witness to understand it. Accused's arguments were also perfectly sane, to the best of witness' knowledge. The only thing that witness thought was insane was the threat of the accused to horsewhip Gurley on the street.

Witness subsequently met accused once in a while—say, once in a fortnight—and talked with him about other matters. Never noticed anything irrational. It is impossible to determine from the stenographer's notes at what time the objection was made, as there is no mention of it. On the other hand, the bill puts two questions together, which, according to the notes, were asked separately, thus: "Mr. Gaughan, in any of these conversations, did Mr. Lyons say anything that was irrational? At the time you spoke to him and saw him, did you consider him sane or insane?" The objection was the usual one interposed to the testimony of nonexpert witnesses.

Bill 33. George T. Crawford had known accused 25 or 30 years. Had met him quite often within past year. Had a good many conversations with him. Had played cards with him. "Q. In any of these conversations, did he ever at any time say anything irrational? When you saw, spoke to him, played cards with him? (Objection and ruling.) A. No, sir."

Bill 34. H. Pohlman had known accused about six years, but had had a difficulty with him in the latter part of 1899, and had lost sight of him. Witness gives an account of the difficulty, including conversation with the accused, and is asked: "When you spoke to him and had dealings with him, did you consider him perfectly sane? (Objection and ruling.) A. Yes, sir."

These bills, save bills 15 and 18, which will be further considered, present the single objection that the opinions of the nonexpert witnesses as to the sanity or insanity of the accused were not admissible in evidence unless and until the witnesses had stated the specific facts, and given the reasons upon which they were based.

It will be observed that the question to which the objection was interposed, as per the bills 14, 15, 20, 27, 29, and 33, was not whether the accused was sane or insane, but

whether, in his conversations with the witnesses, he had said anything which appeared to them irrational. From other of the bills, however, it appears that the witnesses were asked whether, from their intercourse with and observation of the accused, the extent of which was stated, they considered him sane or insane—that is to say, whether they so considered him at that time—and as the conclusion which has been reached upon the objection to the questions so propounded necessarily disposes of the same objection as made to the questions presented by the bills above specially mentioned, even assuming that the latter have the effect attributed to them by defendant's counsel, those bills need not be separately considered.

To the general rule that the testimony of a witness should be confined to the facts within his knowledge, and that he should not be heard to give his opinion as to matters which are to be determined by the court or jury, there is the well-established exception under which the opinions of experts are admitted. Beyond this, there are many other exceptions applicable to nonexpert testimony which are equally established. As has been said by the Supreme Court of New Hampshire:

"All concede the admissibility of the opinions of nonprofessional men upon a great variety of nonscientific subjects arising every day and in every judicial inquiry. These are questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, strength, size, age, heat, cold, sickness, and health; questions, also, concerning certain mental and moral aspects of humanity, such as disposition and temper, anger, fear, excitement, intoxication, general character and particular phases of character, and other conditions of things, both moral and physical, too numerous to mention. * * * All evidence," the court proceeds, "is opinion, unless you choose to call it fact and knowledge, as discovered by, and made manifest to the observation of, the witness. * * * Opinions of witnesses derived from observation are admissible when, from the nature of the subject-matter under investigation, no better evidence can be obtained." Hardy v. Merrill, 56 N. H. 227, 22 Am. Rep. 441.

As to whether nonexpert opinion should be admitted to prove mental condition, as

sane or insane, and, if so, upon what conditions, the courts differ considerably, and some of them have modified, and others have reversed, rulings formerly made by themselves upon that subject:

"Whether nonexpert witnesses, other than the subscribing witnesses [to a will], may testify on this question," says Mr. Rapalje, "is a point on which there is a marked difference of opinion. Many decisions hold that other than subscribing witnesses to a will may testify to the appearance of a testator, and to particular facts from which the state of his mind may be inferred, but they will not be permitted to testify as to their opinion or judgment, merely, of his sanity or insanity, without stating the facts from which they draw their conclusions. Other cases hold that they may testify to facts only, and may not give their opinions along with the facts; and still others allow the witnesses who had actual knowledge and opportunities to observe the testator in his lifetime to testify to their opinions as to his sanity, although they are not professional experts, nor subscribing witnesses to the will. But such opinion must be based on personal knowledge and observation, and whether the means of information or facts proved or conclusions drawn, by the witness are of the satisfactory character to base a finding upon, or not, is for the consideration of the jury, under proper instructions." Law of Witnesses, Rapalje, § 291.

In a recent and (judging from the two volumes which have been issued) philosophical and exhaustive treatise on the law of evidence, the author says:

"It may here be assumed that laymen as well as others may, under the opinion rule, express opinions as to sanity and insanity. * * * The inquiry will still remain (since each and every witness must fulfill the requirement of knowledge) whether the particular person put forward to express the opinion has had an opportunity, by observation of the conduct of the one whose mental condition is in issue, to learn something upon the subject, and to form a belief worth listening to? That such an opportunity is necessary, no one has doubted. A precise definition, which shall be at once flexible enough to meet various situations, and exact enough to be a rule at all, is difficult, if not impossible. It has, at any rate, not been devised to the satisfaction of the courts. The truth is that the test should be left in the hands of the trial judge. Neither its exact phrasing, nor its application in a given instance, should be made to occupy the time of the highest courts. The attempt to invent an all-sufficient form of words is as inexpedient as it is vain." Wigmore on Evidence, vol. 1, § 689, p. 785.

The text quoted is abundantly supplemented by the citation of adjudged cases in which

it has been held that the nonexpert witness must confine himself to a statement of facts; that this may, however, include testimony as to whether the person under investigation was coherent or incoherent, rational or irrational; that such a witness, after stating specific facts, may give his opinion as de-duced therefrom; that he may give his opinion after stating facts and reasons; that he may give his opinion together with the facts and reasons upon which it is based; that he may give his opinion provided he states such facts and reasons; that he may give his opinion where it appears that he has had ade-quate opportunities for observation, etc.

In Massachusetts, where the rule has been and is that the nonexpert witness, other than the subscribing witness to a will, must con-fine himself to facts, it has been held that persons acquainted with the testator, though neither subscribing witnesses to his will nor medical experts, may testify whether they noticed any change in his intelligence, or want of coherence in his remarks. "The question," said Gray, J., "did not call for an expression of opinion upon the question whether the testator was of sound or un-sound mind, which the witnesses, not being either practicing physicians or attesting wit-nesses, would not be competent to give. The question whether there was an apparent change in a man's intelligence or understand-ing, or want of coherence in his remarks, is a matter, not of opinion, but of fact, as to which any witness who has had an oppor-tunity to observe may testify, in order to put before the court or jury the acts or conduct from which the degree of his mental ca-pacity may be inferred." Barker v. Comins, 110 Mass. 477.

Under the Code of California, only experts and "intimate acquaintances" can testify as to a person's mental condition; but it has been held that whether a witness is an inti-mate acquaintance is generally a matter for the trial court to decide, and that others may be asked as to a grantor's appearance at a given time, with reference to his being rational or irrational, as the question calls for a fact, and not an opinion as to his men-tal conditions. Holland v. Zollner, 102 Cal. 633, 36 Pac. 930, 37 Pac. 231.

In the case of Hardy v. Merrill, supra, "the question was as to the sanity of the testator. J., his brother, and other wit-nesses, were asked to give their opinions, from their observation of his appearance and conduct, of his sanity. The trial court re-fused to hear the opinions. Held error," and that Boardman v. Woodman [47 N. H. 120], State v. Pike [49 N. H. 399, 6 Am. Rep. 533], State v. Archer [54 N. H. 465], and the other contrary decisions, must be overruled; and it was laid down as the rule for the future in that state [New Hampshire] "that nonprofessional witnesses, who are not sub-scribing witnesses to a will, may testify to their opinions in regard to the sanity of a testator, when such opinions are founded upon their knowledge of the testator's ap-pearance." Lawson on Expert & Opinion Ev. pp. 544, 545.

Dealing with the question of the admissi-bility of nonexpert opinion in a case involv-ing the right to recover on a policy of life insurance, where the person whose life was insured had committed suicide, the Supreme Court of the United States, through Mr. Jus-tice Harlan, has said:

"The truth is, the statement of a nonprofes-sional witness as to the sanity or insanity at a particular time of an individual whose appear-ance, manner, habits, and conduct came under his personal observation is not the expression of mere opinion. In form, it is opinion, because it expresses an inference or conclusion based upon observation of the appearance, manner, and motions of another person, of which a cor-rect idea cannot be communicated in words to others without embodying, more or less, the im-pressions or judgment of the witness. But in a substantial sense, and for every purpose essen-tial to a safe conclusion, the mental condition of an individual, as sane or insane, is a fact, and the expressed opinion of one who has had ade-quate opportunities to observe his conduct and appearance is but the statement of a fact; not, indeed, a fact established by direct and positive

proof, because in most if not in all cases it is impossible to determine with absolute certainty the precise mental condition of another, yet, being founded upon actual observation, and being consistent with common experience and the ordinary manifestations of the condition of the mind, it is knowledge, so far as the human intellect can acquire knowledge on such a subject. Insanity is a disease of the mind which assumes as many and various forms as there are shades of difference in the human character. It is, as has been well said, a condition which impresses itself as an aggregate on the observer, and the opinion of one personally cognizant of the minute circumstances making up that aggregate, and which are detailed in connection with such opinion, is, in its essence, only a fact at short hand." Citing Wharton & Stille's Med. Juris. § 257.

The learned justice then says that nonexpert opinion should be admitted to prove insanity, not only from necessity, but also because—

"If the witness be permitted to state, as he undoubtedly would be, where his opportunities for observation have been adequate [here quoting from Clary v. Clary, 24 N. C. 83], that he has known the individual for many years; has repeatedly conversed with him and heard others converse with him; that the witness had noticed that in these conversations he was incoherent and silly; that, in his habits, he was occasionally highly pleased and greatly vexed without cause; that, in his conduct, he was wild, irrational, extravagant, and crazy—what would this be, but to declare the judgment of the witness as to what is incoherent or foolish in conversation, what reasonable cause for pleasure and resentment, and what the indicia of sound or disordered intellect? If he may not so testify, but must give the supposed silly and incoherent language, state the degrees and all the accompanying circumstances of highly excited emotion, and specifically set forth the freaks or acts regarded as irrational, and this without the least intimation of any opinion which he has formed of their character, where are such witnesses to be found?

    *    *    *    *    *    *    *

"The jury, being informed as to the witness' opportunities to know all of the circumstances, and of the reasons upon which he rests his statement as to the ultimate fact of sanity or insanity, are able to test the accuracy or soundness of the opinion expressed, and thus, by using the ordinary means for the ascertainment of truth, reach the ends of substantial justice." Conn. Mut. Life Ins. Co. v. Lathrop, 111 U. S. 612, 4 Sup. Ct. 533, 28 L. Ed. 536.

If insanity be a fact, knowledge of the existence of which may be obtained by a nonalienist by observation, it would seem to meet the requirements of the rules ordinarily governing the trial of cases to allow a witness of that character, after qualifying by showing his opportunities for such observation to have been adequate, to give them as his reasons, and thereupon to testify to such fact, leaving the details as to the extent and value of his knowledge to be developed by cross-examination.

In Baldwin v. State, 12 Mo. 223, the defendant, having been convicted of murder, urged on appeal that the following questions propounded to a witness (his father) who had been sworn in his behalf had been improperly excluded, to wit:

"(1) Was his mind affected by his dreams, and other sights which he saw in his dreams? (2) From all that you have seen and known of the defendant, what is your opinion as to whether he was or was not insane at the time he left your house for Arkansas? (3) From the acts and conduct of the prisoner for two years previous to going to Arkansas, was he an insane person?"

After considering the question thus presented, and quoting at length from Clary v. Clary, 24 N. C. 78, the Supreme Court of Missouri said:

"Before a witness should be received to testify as to the condition of mind, it should appear that he had had an adequate opportunity for observing and judging of capacity. But so different are the powers and habits of observation in different persons that no general rule can be laid down as to what shall be deemed a sufficient opportunity for observation, other than that it has in fact enabled the observer to form a belief or judgment thereupon, and the weight of his opinion must depend upon a consideration of all the circumstances under which it was formed."

And the ruling complained of was reversed, and a new trial awarded.

If, upon the other hand, the testimony of a nonalienist, to establish mental condition, is merely opinion, and is admitted in evidence from necessity, and because the witness is unable to reproduce the facts upon which it is based, then any rule which seems to require, as a condition to the giving of the opinion, that the witness must reproduce all such facts in detail, is too broadly stated, since the rule itself rests upon the prop-

osition that such reproduction is impossible.

In Boardman v. Woodman, 47 N. H. 133 (overruled in Hardy v. Merrill, supra), Sargent, J., referring to the decisions which conflicted with the then jurisprudence of the court of which he was a member, and to the difficulty thus presented, said:

"In many of the leading cases in which such opinions have been held admissible, it has been upon the ground of necessity. It is said that, in questions of sanity, witnesses are generally unable, from the nature of the case, to state the facts upon which their opinions are founded, and therefore that such opinions should be received in evidence, yet they almost invariably hold that, before these opinions can be given, the witnesses must state the facts upon which the opinions are founded; thus, in effect, compelling the witnesses to do the very thing which it has just been assumed they cannot do, and imposing upon them the very difficulty, the necessity of obviating which was made the ground, and the principal ground, of establishing this exception to the general rule of evidence."

In any event, the value of the opinion offered being measured either by the opportunities for observation shown to have been enjoyed, or by the facts stated, taken in connection with the reasons given, it could hardly be expected that an appellate court would reverse the finding of the jury because the showing as to the witness' opportunities, or his statement of facts sufficient in themselves to authorize the admission of the opinion, accompanied or followed, instead of preceded, the opinion; and it would be difficult to imagine how a witness could give reasons for an opinion without at the same time disclosing the opinion itself.

The reasonable view, and one which may account in part for the different rulings that have been made, would seem to be that there are some cases in which the facts may be stated, wholly or in part, and should be required, and that there are others in which a statement of the witness' opportunities for observation is sufficient to qualify him. for the purposes of the opinion to be elicited.

Insanity is a disease or abnormal condition which manifests itself in eccentricities of conduct, speech, or appearance; that is to say, in the doing and saying of things which attract attention because, judged by the common standard, they are deviations from that which is regular and usual; and, as all the symptoms necessary to justify a belief in the existence of the disease must necessarily attract the attention of the sane observer, be cause not found within the experience of sane people, it would be strange if such observer, though unable, perhaps, to recall or reproduce all, should be able to recall or reproduce none, of the symptoms upon which he bases the opinion that such disease exists.

Sanity, on the other hand, is not a disease, to be diagnosed by an expert, but a normal condition, so commonplace, that its existence in one attracts no attention from another member of the human race; and it seems to us that no better foundation should be required for the opinion of a sane person, of normal intelligence, affirming the sanity of another, than the facts of adequate opportunity for observation, and the absence of symptoms or manifestations which attracted his attention or impressed themselves on his mind or memory.

The competency of a witness, in so far as adequacy of opportunity for observation is concerned, depends upon his intelligence, considered in connection with the scope of the opinion sought to be elicited. If it be the purpose to show, as in this case, merely that a person appeared to be sane upon particular occasions or during a given period, the most competent witnesses, considered with reference to opportunities for observation, are those who were personally cognizant of what he said and did, and of his appearance upon such occasions or during such period.

In Abbott's Trial Brief (Mode of Proving Facts) p. 428, the author states the rule under consideration, with the condition or requirement attached, as follows:

"It is a generally well recognized rule that opinions of nonexpert witnesses on the question

of sanity or insanity are competent where the witnesses state the facts and circumstances upon which the opinions stated are predicated."

But among the notes explanatory or illustrative of the text we find one reading:

"It is competent for a witness to express an opinion that a man is sane, because sanity is a normal condition; but insanity is exceptional, and can only be shown by the statement of some facts inconsistent with sanity." Citing Lamb v. Lippincott, 115 Mich. 611, 73 N. W. 887.

Mr. Rice, referring to the nonexpert witness, says:

"If expressing the opinion that such person is of unsound mind, he shall state the facts upon which such opinion is founded; but, where he testifies that such person is sane, this is not necessary, since a sane person would not manifest any such eccentricities as usually mark the conduct of persons of unsound mind." Rice, Cr. Ev. vol. 3, § 21, citing Ford v. State, 71 Ala. 385.

We are referred to decisions to the same effect by the Supreme Court of West Virginia and Nevada. State v. Maier, 36 W. Va. 757, 15 S. E. 991; State v. Lewis, 20 Nev. 333, 22 Pac. 241. In Louisiana the rule that the nonexpert must state the specific facts upon which his opinion is founded, as a condition to its admission in evidence, has been applied where the opinion was offered to prove insanity (State v. Coleman, 27 La. Ann. 691), but the question now considered has not been heretofore decided by this court.

Leaving the question of the qualification of nonexpert witnesses whose opinions are offered to prove insanity where we find it, our conclusion in regard to the issue here presented is that, the opinions of the nonexperts having been offered to prove or maintain the sanity of the accused, the only facts necessary to be established in order to the admission of such opinions in evidence were normal intelligence in the witnesses, and adequate opportunities, considered with reference to the scope of the opinions sought to be elicited, for observation of the person whose mental condition was the subject of investigation; and from the recitals of the

bills, and the testimony brought up in connection with them, we think those facts were sufficiently established, and that the opinions were properly admitted. The charge of the judge on this subject seems to have been somewhat more favorable to the accused than his ruling, and, as the latter was correct, the accused could have sustained no injury from the former.

Bill 15 further shows that a question propounded to a state witness testifying in rebuttal was objected to on the ground that it related to the sanity of the accused at a time subsequent to the homicide, which, it is said, was not an issue in the case.

Bill 16. Dr. Salter, an oculist, sworn on behalf of the state in rebuttal, having testified that he had examined the accused on the preceding day, was asked, "What did you find?" to which the same objection as that stated in bill 15 was interposed.

In a comparatively recent case this court said:

"We think it well to add, too, that, on the issue of insanity, testimony as to the conduct of the accused before and after the act is proper to go to the jury." State v. Scott, 49 La. Ann. 258, 21 South. 271, 36 L. R. A. 721.

See, also, State v. Hays, 22 La. Ann. 41.

Beyond this, it appears that defendant had offered the testimony of an oculist (as tending to show insanity at a time subsequent to the homicide) to the effect that he (the accused) was suffering from an affection of the optic nerve known as "choked disc," and the state offered the testimony of another oculist in rebuttal of that testimony. The objections were properly overruled, and have not been urged in this court.

Bill 18. A state witness, testifying in rebuttal, was asked, "Did you ever have any trouble with him?" (referring to the accused), to which it was objected that the defendant's reputation for peace and quietness was not at issue, and, if it were, that it could not be proved by a particular instance, but only by general reputation. As

appears from the statements of the trial judge and the district attorney, made part of this bill, the state was not attempting to prove the reputation of the accused, but was offering testimony in rebuttal of that which had been given on his behalf, to the effect that from childhood, up to 1895, he was quiet, peaceable, gentle, kind, etc. The objection was properly overruled. U. S. v. Guiteau (D. C.) 10 Fed. 161; Abbott's Tr. Br. (Cr. Ev.) p. 504; U. S. v. Holmes, 1 Cliff. 98, 26 Fed. Cas. 353.

Bill 25. Dr. Reiss, an oculist, testifying on behalf of the state, was asked, "Doctor, is a choked disc evidence of insanity?" to which it was objected that the doctor had not been qualified as an expert on insanity, and could not testify as an expert without having been so qualified, and that the matter sought to be elicited was a matter of expert knowledge. It is not disputed that the witness had qualified as an expert oculist, and it appears that his testimony was offered in rebuttal of that given by Dr. Jones, another expert oculist, who, testifying on behalf of the defendant, had stated, in substance, that the latter, after the homicide, was suffering from "choked disc," a swelling of the optic nerve; that the optic nerve is connected with the brain; and that in this instance the swelling was attributable to cerebral irritation, which rendered the accused a dangerous man, likely at any time to commit violence. We are not prepared to say that the gentleman who gave this testimony went outside of the field occupied by his profession, or that another member of that profession, sworn on behalf of the state, was incompetent to testify in rebuttal concerning the same subject-matter, to wit, the pathology of a disease of the optic nerve. The ruling of the learned judge of the district court is therefore sustained.

Bill 32. A witness on behalf of the state was asked on redirect examination, "Now, as a matter of fact, Lyons claimed that he had been wrongfully arrested; that he was not present at the time of the stealing; that he was entitled to damages?" This question referred to an arrest made long before the homicide, and to a claim for damages therefor which the accused had employed the deceased to prosecute for him. Counsel for defendant objected that it was not redirect examination. The court permitted the question to be asked, reserving to the defendant the right to cross-examine upon the new matter which might be elicited. We find no error in this ruling. The matter was within the discretion of the court.

Bill 35. It appears from this bill that, after some of the witnesses for the defendant had been heard, one of the jurors informed the court that another juror had said, "If that was all the evidence the state had, his mind was made up," or "If that was the best the state could do." It further appears that the juror to whom the remark was attributed then said to the court "that there had been a discussion about the jury being locked up for ten or fifteen days, and that he stated that, if they went at the rate of progress that the state had gone through, they would not be locked up very long. He also said that he did not mean his remarks, and that they were innocently made, as that was the first time he had ever served on a jury, and that he had not made up his mind one way or the other." The court then, after a further statement in affirmance of what he had previously said by the juror who had first spoken, "instructed the jury that the case should not be discussed by them until the entire evidence was submitted, and that their opinions had to be formed from the evidence in the case, and nothing else, after they had received the evidence." Counsel for defendant then objected, and requested the court to ask the jury whether the incident would be apt to influence them in arriving at a verdict, or whether it had prejudiced them, whereupon the judge ruled that, after hearing the statements of the two jurors, he

could see nothing in what had taken place which could possibly have prejudiced any member of the jury, and he charged the jury that they were to disregard the incident which had thus been brought to their attention, and were to consider the evidence offered on both sides fairly and impartially, and from that evidence were to reach their conclusion as to the facts, to which ruling counsel for defendant excepted and took his bill.

In signing this bill, the judge says:

"It was evident to me that the statement of Gebhauer was not prejudicial to the defendant. If anything, it showed a leaning to the accused, but the statement was one which did not show any prejudice, and which, if the state had then rested its case, was true, for up to that time there was no evidence before the jury sufficient to convict."

We can discover nothing in the circumstances narrated in the bill from which it could be inferred that the accused suffered any prejudice, and the verdict of a jury is not vitiated by harmless irregularity. State v. Garig et al., 43 La. Ann. 365, 8 South. 934; State v. Fruge, 28 La. Ann. 657.

Bill 36 sets forth that the judge instructed the jury that:

"Where insanity is set up as a defense for homicide, it must be established by the defendant to the satisfaction of the jury. In order to overcome the presumption of sanity, and shield the defendant from legal responsibility, when he relies upon his insanity as an excuse for his criminal act, he must establish such insanity to the satisfaction of the jury, by a preponderance of the whole evidence in the case."

To which counsel for defendant excepted, etc.

Bills 42, 43, and 44. Counsel for the defendant requested that the jury be specially charged that:

"Whenever intent is a necessary element to an offense, and sanity is essential to intent, the state must prove the sanity of the accused beyond a reasonable doubt." That: "If the defense goes to negative malice, and malice is an essential part of the case of the prosecution, then if, on the whole evidence, there be reasonable doubt as to malice, there should be an acquittal." That: "If some proof of insanity is adduced, and, upon consideration of the whole evidence, including that supplied by the presumption of sanity, the jury are not satisfied beyond a reasonable doubt of the sanity of the accused, they should acquit him."

The judge gave the charge objected to, and refused to give the special charges asked, and the counsel excepted and took their bills.

Of the three rules on this subject, to wit: (1) The defendant must prove beyond a reasonable doubt that he was insane at the time of the commission of the act charged against him; (2) he must satisfy the jury of such insanity by a preponderance of the whole evidence in the case; (3) if, upon the whole evidence, there be reasonable doubt as to whether he was sane or insane, he should be acquitted—the second is supported by the weight of authority in England and in this country. McLain on Cr. Law, vol. 1, § 178; Boswell v. State, 63 Ala. 308, 35 Am. Rep. 20; Baldwin v. State, 12 Mo. 223; State v. Scott, 49 La. Ann. 253, 21 South. 271, 36 L. R. A. 727 (and note thereto appended, in which the authorities are collated). In Louisiana that rule was applied in State v. Burns, 25 La. Ann. 302, and State v. Coleman, 27 La. Ann. 691, and affirmed in State v. Scott, 49 La. Ann. 253, 21 South. 271 (reported as the main case in 36 L. R. A., supra). In the case last mentioned, Mr. Justice Miller, as the organ of this court, in effect, overruled a former decision, rendered in the case of State v. De Rance, 34 La. Ann. 186, 44 Am. Rep. 426, where it had been held that the onus is on the accused to prove beyond a reasonable doubt the insanity relied on by him, and returned to the jurisprudence as established by the decisions in State v. Burns and State v. Coleman, supra; the rule thus readopted having been subsequently mentioned in terms of approval in State v. Paine, 49 La. Ann. 1094, 22 South. 316. We are now urged by the learned counsel who, by appointment of the district court, are ably discharging the duty of representing the accused, for the purposes of his defense, to go a step farther,

and to hold that if, upon the whole evidence, the sanity of a person charged with crime is not established beyond a reasonable doubt, he should be acquitted, and that the judge a quo should have so charged the jury. This view of the matter finds support in a decision of the Supreme Court of the United States (Davis v. United States, 160 U. S. 474, 16 Sup. Ct. 353, 40 L. Ed. 499), in the decisions of a minority of the state Supreme Courts, and among a minority of the writers on the subject of criminal law and evidence. The argument in its favor, briefly stated, is that the presumptions of innocence and of sanity are alike rebuttable, and should go to the jury, to be considered by them with other evidence, and if, taking all such evidence and the presumptions together, the jury entertain a reasonable doubt as to the capacity of the accused to have harbored a malicious or criminal intent, he should be acquitted, or, to state it in other words, that the accused is presumed to be innocent until his guilt is proven beyond a reasonable doubt; that, as a question of evidence, the burden of proving sanity, as a necessary ingredient of crime, rests upon the prosecution; that the presumption of sanity is merely an instrument by which this proof may, under some circumstances, be made; and that if, upon considering it together with all the other proof produced, including the presumption of innocence, there remains a reasonable doubt as to whether the sanity is established, the prosecution fails, since it thereby fails to establish a necessary ingredient of the crime charged. This argument is based on the proposition that, for the purposes of a criminal prosecution, the presumption that the accused is innocent of the crime with which he is charged is stronger, more enduring, and more difficult to rebut than the presumption in favor of his sanity, and that, whilst the former can be rebutted only by proving guilt beyond a reasonable doubt, the latter, for all practical purposes,

ceases to exist the moment it is attacked, and before even a reasonable doubt of its soundness is established or suggested. As stated, this proposition is mere assertion, and the question remains, upon what authority is it said that in a criminal prosecution the presumption that the accused is sane, which is paramount in the beginning, yields its precedence to the presumption of innocence the moment that any testimony, however weak, is offered to rebut it? If the matter is to be determined by the rules of the common law, the answer would seem to be that, unless the courts of England and of this country have in the past united in misinterpreting those rules, and unless the English and a majority of the American courts are still misinterpreting them, the assertion in question is without authority.

In 1812 Lord Mansfield, on the trial of Bellingham for the murder of Mr. Percival, charged the jury that the insanity set up on behalf of the defendant must be proved beyond a reasonable doubt, and that rule seems to have been applied in some of the earlier cases in this country. State v. Spencer, 21 N. J. Law, 196; State v. Huting, 21 Mo. 464. In 1843, however, in the McNaughten Case, and possibly at an earlier date, the English judges accepted the modification, if it be a modification, that "the jurors ought to be told in all cases that every man is presumed to be sane and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary be proven to their satisfaction, and that, to establish a defense on the ground of insanity, it must be clearly proven that at the time of the committing of the act the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know that he was doing what was wrong"; and the rule thus laid down, in so far as it concerns the burden of proof, was accepted and applied by a vast

majority of the ablest judges in this country, including Chief Justice Shaw, of Massachusetts, who in 1844 charged a jury that "the ordinary presumption is that a person is of sound mind until the contrary appears, and, in order to shield one from criminal responsibility, the presumption must be rebutted by proof to the contrary satisfactory to the jury"; giving the subsequent instruction, in response to inquiry from the jury, in effect, that the proof need not establish insanity beyond a reasonable doubt, but should do so by a preponderance of evidence. Com. v. Rogers, 7 Metc. (Mass.) 500, 41 Am. Dec. 458.

In a later case in the same court, the instructions were somewhat more specific, as follows:

"The burden is on the commonwealth to prove all that constitutes the crime of murder. And as that crime can be committed only by a reasonable being—a person of sane mind—the burden is on the commonwealth to prove that the defendant was of sane mind when he committed the act of killing. But it is a presumption of law that all men are of sane mind, and that presumption sustains the burden of proof unless it be rebutted and overcome by satisfactory evidence to the contrary. In order to overcome this presumption of law, and shield the defendant from legal responsibility, the burden is on him to prove to the satisfaction of the jury, by a preponderance of the whole evidence in the case, that at the time of committing the homicide he was not of sane mind." Com. v. Eddy, 7 Gray, 583.

Dealing with the same subject, the Supreme Court of Pennsylvania, through Agnew, C. J., has said:

"Insanity is a defense. It presupposes the proof of the facts which constitute a legal crime, and is set up in avoidance of punishment. Keeping in mind, then, that an act of willful and malicious killing has been proven, and requires a verdict of murder, the prisoner, as a defense, avers that he was of unsound mind at the time of the killing, and incapable of controlling his will, and therefore that he is not legally responsible for his act. * * * Soundness of mind is the natural and normal condition of men, and is necessarily presumed, not only because the fact is generally so, but because a contrary presumption would be fatal to the interests of society. No one can justly claim irresponsibility for his act contrary to the known nature of the race of which he is one. He must be treated and be adjudged to be a reasonable being until so abnormal a fact as

a want of reason positively appears. It is therefore not unjust to him that he should be conclusively presumed to be sane until the contrary is made to appear on his behalf. To be made so to appear to the tribunal determining the fact, the evidence of it must be satisfactory, and not merely doubtful, as nothing less than satisfaction can determine a reasonable man to believe a fact contrary to the course of nature." Ortwein v. Com., 76 Pa. 414, 18 Am. Rep. 420.

Quoting some of the foregoing authorities, and referring to the doctrine now pressed upon this court, the Supreme Court of Alabama, through Stone, C. J., in 1879, used the following language:

"We hold, then, that insanity is a defense which must be proven to the satisfaction of the jury, by that measure of proof which is required in civil cases, and a reasonable doubt of insanity, raised by all of the evidence, does not justify an acquittal. The doctrine we have been combating is purely American, and we regard it as an erroneous application of the doctrine of presumed innocence." Boswell v. State, 63 Ala. 326, 35 Am. Rep. 20.

Since this last-mentioned decision, the state of Alabama seems to have regulated the matter by statute, as we find the following in a late report:

"Under Cr. Code 1896, § 4938, providing that the burden of proving irresponsibility for crime is on the accused, a requested instruction that, in order to sustain the defense of insanity, it was not necessary that the insanity be established by a preponderance of the evidence, but if, from all the evidence, the jury had a reasonable doubt as to defendant's sanity, they should find him not guilty, was properly refused." Porter v. State (Ala.) 37 South. 81.

In another recent case the Supreme Court of Washington, after stating the charge as given, on the one hand, and as requested, on the other, said:

"The rule contended for by the appellant [being the rule now contended for by the appellant before this court] is sustained by the Supreme Court of the United States, and by the Supreme Courts of the following states: Florida, Illinois, Indiana, Michigan, Kansas, Mississippi, Nebraska, New Hampshire, New York, Vermont, and Wisconsin [here follows a list of cases decided in those states]; whilst the highest courts of the following states maintain the rule that, where insanity is set up as a defense in a criminal case, it must be established by a preponderance of the evidence: Alabama, Arkansas, California, Connecticut, Delaware, Georgia,

Idaho, Iowa, Kentucky, Maine, Massachusetts, Minnesota, Missouri, Nevada, New Mexico, New Jersey, Ohio, Pennsylvania, South Carolina, Texas, Utah, Virginia, West Virginia. [Here follows a list of cases decided in the jurisdictions mentioned.] * * * In the states of Oregon and Louisiana the defendant is required by statute to prove insanity beyond a reasonable doubt."

In conclusion the court adopts the rule whereby the onus of proving insanity, when set up as a defense in a criminal prosecution, by a preponderance of evidence, is held to rest on the accused. It may be here remarked that, though the state of Oregon has enacted a statute such as that mentioned, there has been no such legislation in Louisiana.

If, then, it be true that, according to the common law of England, as interpreted by the courts of that country, and according to the common law adopted by the states of this Union, as interpreted by the highest courts of a majority of those states, the presumption of sanity has always been held to prevail in a criminal proceeding until overcome by at least a preponderance of evidence satisfactory to the jury, it is evident that any rule to the contrary which may obtain in a particular state represents merely a departure by that state from the common law as originally understood in England and by a majority of the English colonies in America, and is not only purely American, but purely local, and it may be observed that whilst, from the lists given in the case last cited, it appears that nine (or, if we include West Virginia, ten) of the original colonies adhere to the English interpretation, and but three have departed therefrom, it will perhaps be found upon examination that even those three at one time accepted that interpretation.

It seems quite certain, in any event, that when, in 1805, the General Assembly of this state enacted the law, which stands unrepealed, providing that "all the crimes * * * hereinbefore named [including murder] shall be * * * construed according * * *

113 LA.—32

to the law of England, and the * * * the method of trial, the rules of evidence, and all other proceedings whatsoever, in the prosecution of such offences, * * * changing what ought to be changed, shall be, except as by this act otherwise provided for, according to said common law" (Act No. 50 of 1805), there was no room for reasonable doubt that the rule here in question, as then understood and applied by the courts administering the common law of England, was at least as severe in its application to a person accused of crime as the rule which has been applied by the trial court in the instant case.

The presumptions of innocence and of sanity which confront each other in every criminal case are established by the same law —the one from considerations of humanity, the other from considerations of public policy—and it is conceded that, where all the ingredients of a crime, save sanity, are admitted or proved, and there is no other evidence on the subject, the presumption of sanity is sufficient to establish or maintain that condition, and to rebut the presumption of innocence. "The presumption of sanity and the presumption of innocence coming in conflict, the latter must give way, according to the best considered doctrine on this question." Lawson on Presumptive Evidence, p. 458. This being true, and the function and effect of each presumption being assigned and determined by the law which established them, it is difficult to understand the logic of the proposition that because that law holds, in general, that the presumption of innocence follows the defendant throughout the whole case, it necessarily follows him in a case which the law itself provides shall constitute an exception to the rule so established by it. It remains to be demonstrated that the presumption that the defendant in a criminal prosecution is innocent is more necessary to the well-being of society, or that it is better founded in probability, than the

presumption of his sanity; and if it be true that, by reason of the law, which has established both, the latter overthrows the former as they confront each other, each upon its own merits, at the beginning of the trial, the question arises, in what case, and at what time, under the law, does that rule cease to operate? We know that in civil cases it does not so cease until the presumption of sanity has been rebutted by affirmative and convincing proof, and we know, also, that the mere plea of insanity, in a criminal case, does not affect the presumption of sanity, but that in the face of such plea, unsupported by proof, it would be the duty of the trial judge to instruct the jury that the law presumes the defendant to be sane, and that they ought to be governed by the law. The answer given to the question propounded seems to be that the rule of law to which we have alluded ceases to operate, and the presumption of sanity gives way to the presumption of innocence, when the defendant, who is relying upon the plea of insanity to shield him from the consequence of what must be held to be a crime unless that plea is established, makes a beginning of proof in its support, and that from that moment, and with the question of the character of the beginning so made undetermined, the presumption of sanity becomes of no effect, and the question of sanity vel non becomes a question at large, in which the prosecution must establish the affirmative beyond a reasonable doubt. In other words, that whereas the presumption alone is sufficient, primarily, to establish the sanity of the defendant beyond a reasonable doubt, the certainty of (mental) conviction, so established, is to be regarded as shaken or destroyed by any testimony, from any source, and however unconvincing, tending to prove insanity, or suggestive of a doubt upon the subject, that may be introduced. For the reasons which have been given, we are unable to concur in such a conclusion, and therefore affirm

the ruling of the court a qua, and the jurisprudence of this court, upon which it is predicated.

Bill 37 was taken to the following portion of the charge, to wit:

"That condition of mind which relieves the accused of criminal responsibility, and we term insanity, is that at the time of the commission of the act he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know that he was doing wrong—in other words, that he was incapable of entertaining a criminal intent, which is an indispensable element in every crime."

Bill 46 was taken to the refusal of the judge to charge that:

"If the jury believe that the accused acted under an insane, irresistible, homicidal impulse, even though he was able to distinguish between right and wrong, he is entitled to an acquittal."

It appears in the record that, in addition to what is stated in bill 37, the judge charged among other things, as follows:

"If, from all the evidence in the case, you believe beyond a reasonable doubt that the defendant committed the act of which he is accused, in the manner and form as charged in the indictment, and that at the time of the commission of said crime the defendant knew that it was wrong to commit it, and that he was mentally capable of choosing either to do or not to do the act constituting such crime, and of governing his conduct according to such choice, then it is your duty, under the law, to find him guilty.

*     *     *     *     *     *     *

"Again, if the accused knew that he was doing wrong, yet, acting under an irresistible impulse, having lost his power of self-control, kills the party, he will not be criminally liable. It must be the irresistible impulse of a lunatic, and not the violent passion of a sane man, prompted by revenge, hatred, jealousy, envy, etc., which does not exempt from criminal liability nor confer irresponsibility."

The requested charge, if correctly understood, should have conveyed to the jury the idea already conveyed, as we must assume, by the charge given by the judge.

If, however, the learned counsel intended, by means of the requested charge, to propound the doctrine of moral insanity (which consists of irresistible impulse coexistent

with mental sanity) as a defense for crime, we concur with Dr. Wharton (Wharton, Hom. § 574), the Supreme Court of Alabama, and other authorities upon the subject, that such doctrine "has no support in either psychology or law." And if the idea intended to be conveyed was that a person laboring under an insane delusion on a particular subject, but otherwise sane, is excusable for crime committed under the influence of such delusion, even though the facts imagined by him, if real, would not have justified the act, it is sufficient to say that the requested charge does not cover that proposition, and the proposition would not be here referred to, were it not that it is discussed in this connection by the counsel in their brief. They say:

"It will be seen that the irresistible impulse is not a distinct form of insanity, but is merely one of the effects or manifestations of delusionary insanity, which was the only form contended for by this defendant."

And they thereupon quote in extenso from the opinion in Parsons v. State, 81 Ala. 581, 1 South. 217, 60 Am. Rep. 193. The requested charge reads:

"If the jury believe that the accused acted under an insane, irresistible, homicidal impulse, even though he was able to distinguish," etc.

In the charge as given, the jury were told, in substance, that, in order to convict the accused, they must not only find that at the time of the commission of the act in question he knew its nature and quality, and knew that it was wrong to commit it, but that they must also find that he was mentally capable of choosing whether to commit it or not, and of governing his conduct according to such choice; and they were further told that, although he may have known that he was doing wrong, he should be acquitted if they found that he acted under an irresistible impulse, having lost his power of self-control, provided such impulse was an insane one, or "the irresistible impulse of a lunatic, and not the violent passion of a sane man," etc.

In the case mainly relied on by counsel, the court states its conclusions as follows:

"In conclusion of this branch of the subject, that we may not be misunderstood, we think it follows very clearly from what we have said that the inquiries to be submitted to the jury in every criminal trial, where the defense of insanity is interposed, are these:

"(1) Was the defendant, at the time of the commission of the alleged crime, as a matter of fact, affected with a disease of the mind, so as to be idiotic or otherwise insane? (2) If such be the case, did he know right from wrong, as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible. (3) If he did have such knowledge, he may nevertheless not be legally responsible, if the two following conditions concur: (1) If, by reason of the duress of such mental disease, he had so far lost the power to choose between the right and wrong and to avoid doing the act in question as that his free agency was at the time destroyed; (2) and if at the same time the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely. Parsons v. State, 81 Ala. 596–597, 1 South. 217, 60 Am. Rep. 193."

By comparing the instructions given in the case at bar with those recommended in the opinion invoked, it will be seen that the former were more favorable to the accused, since they entirely omitted the second condition, as contained in the latter, in which the significant word "solely" is used. We are therefore of opinion that if there was any error in the charge, or refusal to charge, of the judge a quo, as presented by the two bills now under consideration, such error was not to the prejudice of the defendant.

Bill 38 was taken to so much of the charge given as reads as follows:

"When monomania or insane delusion is the species of insanity set up by the accused, it may operate as an excuse for a criminal act only when the delusion is such that the person under its influence has a real and firm belief in some fact, not true in itself, but which, if it were true, would excuse the act, as when the belief is that the party killed has an immediate design on his life, and under that belief the insane man kills his supposed enemy in supposed self-defense."

Bill 39 was taken to so much of the charge given as reads:

"But if the delusion held by the defendant was that the party whom he killed had acted dis-

honestly towards him, or had not properly attended to his business—in fact, had committed any act which did not expose defendant's life to imminent danger or did not subject his person to great bodily harm—such delusion would not justify an acquittal, as, even though such delusion existed, it would not be of such a character, even if it were true, as to justify homicide."

Bill 45 was taken to the refusal of the court to give the following charge, specially requested:

"If the jury believe from the evidence that the defendant insanely believed at the time of the commission of the act either that the imagined evil was so intolerable as to make life-taking necessary or justifiable, in order to avert it, or that life-taking was an appropriate and just way of getting rid of it, he is entitled to be acquitted."

Considering those portions of the charge of the judge a quo which have heretofore been quoted in connection with bills 37 and 46, it will be seen that the proposition involved in the bills now under consideration is that, though an insane or partially insane man be laboring under a delusion in regard to a matter which does not threaten him with death or with great bodily harm; though he know the difference between right and wrong, as applied to a particular act, which, if he be sane, is a crime; though he be mentally capable of choosing to do or not to do such an act, and of governing his conduct according to such choice; and if he be not driven thereto by an insane impulse—he may yet shield himself from the consequences of such act by the plea of insanity. If the requested charge means anything less than this, it is covered by the charge given. If it means this or more, it is not sound in law, and was properly refused. Com. v. Wireback, 190 Pa. 138, 42 Atl. 542, 70 Am. St. Rep. 625.

Bill No. 41 was taken to so much of the charge given as reads:

"The opinions of expert witnesses are entitled to such weight as you deem proper to give them. You may accept or reject such opinions, as you may accept as true, or reject as false, any other facts in the case."

The jurors were the sole judges of the credibility of the witnesses, and it was the duty of the judge to so inform them.

After the accused had been convicted, and, as we infer, after a motion for new trial had been overruled, counsel for defendant filed a special plea of "present" insanity, and prayed for a trial on the issue so presented. The court thereupon appointed a commission de lunatico inquirendo, and ordered that the matter be tried by a jury. Thereafter, however, the court entered an order revoking the order so made (for trial by jury) on the ground that the same had been prematurely made, and that the question presented was, one which might be determined by the court or submitted to a jury, as the court might deem advisable. To this the counsel for defendant excepted on the ground that the order of revocation had been made without giving the accused a hearing, and that he was thereby deprived of due process of law, as guarantied by the Constitutions of the United States and of the state of Louisiana. Upon the bill bringing up this exception, the judge makes the following statement:

"I am under the impression that a judge has the absolute right to revoke any preliminary order given by him which does not and cannot cause irreparable injury. Whether the plea of present insanity should be tried at all is one entirely within the sound discretion of the court. The commission de lunatico inquirendo was appointed by the court to satisfy the mind of the court as to the sanity, vel non, of the accused. If the court's mind is fully satisfied of the sanity of the accused upon and by the return day of the commission, there will be no need to try the question by a jury; and if, on the other hand, the report of the commission leaves any doubt upon the question in the mind of the court, it will then be time to call upon a jury to decide the question."

The commission having reported that, in their opinion, the accused was not insane, but was in a mental condition of full responsibility, he was thereafter called up for sentence, whereupon his counsel demanded a trial by jury, on the plea of "present" insanity, and, the demand having been re-

WERNER v. MARX.

fused, they again excepted; the bill reserved including an objection to the filing of the report of the commission on the ground that the same had not been sworn to, with reference to which objection the judge states that the commission had been appointed to inform the court as to the mental condition of the accused, and had reported to the judge of the court, and that he was satisfied that the accused was sane.

It is well settled that if, after a regular trial and conviction, in which the issue of insanity vel non has been submitted to the jury, a suggestion is made of the "present" insanity of the accused, unless the law of the state in which the trial has taken place so ordains, it is not necessary that the question so presented should be tried by a jury, and the refusal to order such trial is not a denial of due process of law. Nobles v. Georgia, 168 U. S. 398, 18 Sup. Ct. 87, 42 L. Ed. 515; Buswell on Insanity, 459; Clevenger on Medical Jurisprudence of Insanity, vol. 1, p. 194; Baughn v. State (Ga.) 28 S. E. 68, 38 L. R. A. 577; Webber v. Com., 119 Pa. 223, 13 Atl. 427, 4 Am. St. Rep. 634; People v. McElvaine, 125 N. Y. 596, 26 N. E. 929; State v. Arnold, 12 Iowa, 479; People v. Pico, 62 Cal. 50; Com. v. Buccieri, 153 Pa. 539, 26 Atl. 228; State ex rel. Armstrong v. Judge, 48 La. Ann. 503, 19 South. 475; State ex rel. Chandler, praying, etc., 45 La. Ann. 700, 12 South. 884; State ex rel. Paine v. Judge, 49 La. Ann. 1500, 22 South. 738.

In their motion for new trial, counsel for defendant again presented the points covered by the bills of exception which have been considered. They also in the course of the trial took a few other bills, which were without merit, and have not been pressed in this court. They have discharged their duty faithfully and diligently, and have secured to the defendant a trial such as the law entitled him to. He must now abide the result.

Judgment affirmed.